# VICTORIA WOOD FRIEZO *v.* DAVID FRIEZO
## (SC 17456)

Sullivan, C. J., and Borden, Norcott, Katz,
Palmer, Vertefeuille and Zarella, Js.[1]

---

[1] This case originally was argued before a panel of this court consisting of Chief Justice Sullivan and Justices Norcott, Katz, Palmer and Zarella. Thereafter, the court ordered, sua sponte, that the case be considered en banc pursuant to Practice Book § 70-7 (b). Accordingly, Justices Borden and Vertefeuille were added to the panel. They have read the record, briefs and transcript of the oral argument.

The listing of the justices reflects their seniority status on this court as of the date of argument.

Argued October 17, 2005—officially released February 6, 2007

*Wesley W. Horton*, with whom were *Kenneth J. Bartschi* and, on the brief, *Brendon P. Levesque, Edward Nusbaum, Ronald W. Crawley*, certified legal intern, and *Clarisse N. Thomas*, certified legal intern, for the appellant (defendant).

*Gary I. Cohen*, for the appellee (plaintiff).

*Opinion*

ZARELLA, J. The defendant, David Friezo, appeals from the judgment of the trial court[2] dissolving his marriage to the plaintiff, Victoria Wood Friezo, and issuing certain financial orders following a determination that the parties' prenuptial agreement was unenforceable. The defendant claims that the trial court improperly: (1) concluded that the parties' prenuptial agreement was unenforceable; (2) presumed that the parties were entitled to an equal distribution of the marital property; (3) included in the defendant's income $3,846,029 in management fees and $4,922,645 in performance fees associated with the defendant's interest in certain hedge funds when no such income existed; (4) concluded that the defendant's testimony lacked credibility; and (5) awarded the plaintiff $125,000 in attorney's fees even though she received a substantial lump sum property award. We conclude that the prenuptial agreement was enforceable and, accordingly, reverse the judgment of the trial court.

---

[2] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

## I

## FACTS

The trial court made the following specific findings and conclusions. The plaintiff, a citizen of the United Kingdom with a high school education, began working in London, England, for Bankers Trust as a trader's assistant and personal aide in 1994. "The plaintiff worked under the direction of the defendant[3] . . . [and] [t]he parties began dating within one week of the plaintiff's new employment. Six or eight weeks later, the parties became sexually intimate. The plaintiff moved out of her mother's house two weeks later to live with the defendant in his . . . apartment. . . . The parties maintained their finances separately. The defendant paid the shelter costs but did not provide any cash, credit card or bank account access to the plaintiff. . . . The plaintiff paid her own expenses. Prior to their marriage, the parties never had any conversation about the defendant's income or assets. The plaintiff never inquired; the defendant never offered any information.[4]

"The parties traveled together to New York City in December, 1994, and stayed at the defendant's apartment on 65th Street. They traveled to Florida in January, 1995, where the plaintiff met the defendant's parents. For the next two years, the plaintiff flew with the defendant frequently on his business and personal trips to the

---

[3] The defendant is a citizen of the United States.

[4] The plaintiff testified as follows:

"[The Plaintiff's Counsel]: Did [the defendant] discuss with you any aspect whatsoever of his finances during the time that you and he were living together?

"[The Plaintiff]: No.

"[The Plaintiff's Counsel]: Did you ever ask?

"[The Plaintiff]: No.

"[The Plaintiff's Counsel]: Was it of any interest to you?

"[The Plaintiff]: No."

United States. . . . In the spring of 1996, the plaintiff accompanied the defendant as he looked for a house to buy in Connecticut. The defendant [subsequently] purchased a house . . . [in] Westport . . . .

"The plaintiff continued at Bankers Trust uneventfully for three years. As a trader's assistant, she entered and recorded stock transactions that the traders had done. As a personal aide to the defendant, she booked his travel to Hong Kong and Tokyo, made hotel and dinner reservations, and helped plan his workday. She did not decide upon the defendant's meetings, but she did organize them. She was responsible for keeping a log as to the defendant's whereabouts and appointments. She submitted the defendant's expense account receipts and bills to Bankers Trust. On at least one occasion, the defendant directed the plaintiff to photocopy certain of the defendant's financial documents for him to give to his accountant.[5] The plaintiff denies that she made any attempt to peruse the documents to determine their content. She did not know the defendant's income or his net worth. . . .

"In the summer of 1997, the defendant asked the plaintiff to go to the United States to oversee renovations and furnishing of the Westport house. The plaintiff . . . readily agreed to his request . . . [and] took an unpaid leave of absence from the Bankers Trust job. In October, 1997, the plaintiff received notice that her employment at Bankers Trust was terminated because of the extraordinary length of her leave of absence. She continued to look after the renovations at the Westport house. Because her tourist visa allowed her to stay in the United States only ninety days at a time, the plaintiff traveled home to London every three months for a stay of a week before returning to Westport. . . . As in Lon-

[5] The documents contained financial information necessary to prepare the defendant's income tax returns.

don, the plaintiff provided all the domestic services and ran personal errands for the defendant. The defendant paid the mortgage and utility expenses at the Westport house. The plaintiff used her savings to pay all her other living expenses. . . .

"In 1998, the plaintiff discovered that she was entering the [United States] on a tourist visa for the last time. The . . . trip to Westport [in the summer of 1998] would be her last unless her immigration status changed. The parties went together to see an immigration lawyer in August, 1998. The plaintiff's marriage to an American citizen would change her immigration status and allow her to stay in the United States. The defendant proposed marriage to the plaintiff on August 20, 1998. The parties needed to marry by the latter part of November, 1998, in order for the plaintiff to remain legally in the United States. Shortly after proposing marriage, the defendant informed the plaintiff that a premarital agreement would be necessary. The plaintiff was not familiar with the concept of a premarital agreement but expressed a willingness to sign one if that is what the defendant wished. The parties set Friday, November 6, 1998, as the wedding date. The plaintiff arranged for a justice of the peace to preside.

"The plaintiff heard nothing more about the possible premarital agreement until Monday, November 2.[6] At that time, the defendant informed the plaintiff that the wedding could not take place on November 6 because the premarital agreement was not ready. There was no

---

[6] The plaintiff testified that, although she and the defendant did not discuss the possible contents of a prenuptial agreement, she knew "he was working on one" because every time she attempted to plan the actual wedding date, he told her that the agreement was not ready. The plaintiff also testified that she did not discuss the agreement with anyone else, such as family members or an attorney, because she and the defendant wanted to keep their November wedding a secret so that a subsequent ceremony to be held the following July with family members present would be "special."

discussion between the parties about possible terms of a premarital agreement. The plaintiff contacted the justice of the peace to set a new wedding date of November 13.[7]

"Both parties were in New York City at the defendant's apartment on Thursday evening, November 5, when the defendant handed . . . the plaintiff a facsimile copy of a draft premarital agreement . . . . He told her to look it over and get it signed."

The record also reveals the following undisputed facts. The draft agreement consisted of nineteen articles. Article one, entitled "Acknowledgment of Present Situation: Changes in Circumstances," included the following language: "Each party acknowledges for himself or herself that both parties have substantial assets and that each would be able to adequately support himself or herself." Articles ten and eleven, entitled "Husband's Representations"[8] and "Wife's Representa-

---

[7] The plaintiff testified that, if the prenuptial agreement had not been completed by November 13, the parties would have had to reschedule the wedding for a later date. Apparently, this would not have been difficult because the only persons present at the wedding, in addition to the plaintiff and the defendant, were the justice of the peace and his wife. The plaintiff also testified that the wedding could have been rescheduled for any date before November 30, 1998, without endangering her immigration status.

[8] Article ten of the draft agreement provided: "(A) *The Husband represents that his assets and liabilities are substantially as set forth on Schedule 'A' annexed hereto and that his gross income from all sources (excluding capital gains) for 1997 was approximately ____ Dollars.*

"(B) *The Husband acknowledges that he has examined Schedule 'B' annexed hereto which sets forth the Wife's assets and liabilities. He also acknowledges that the Wife's assets and liabilities may increase or decrease. He further acknowledges that he has weighed all of the factors, conditions and circumstances likely to influence his judgment herein, that the provisions of this Agreement have been fully and satisfactorily explained to him and all of his questions pertinent thereto have been fully and satisfactorily answered by counsel of his own selection,* that he is aware that, by executing this Agreement, he is giving up valuable rights in and to the Wife's Property, including, without limitation, all benefits under all present and future Plans resulting from services heretofore or hereafter performed and/or from contributions made principally (as between the parties) by or on behalf of the Wife (except as expressly and voluntarily otherwise provided by the Wife),

tions,"[9] respectively, contained nearly identical language describing each party's assets and liabilities by reference to schedules A and B, and each party's gross income in 1997, although the spaces provided for the statements of income were not filled in. Articles ten and eleven further provided that each party acknowledged that he or she had examined the assets and liabilities set forth in the schedule of the other party and clearly understood and consented to all of the agreement's terms. See footnotes 8 and 9 of this opinion. Schedules A and B were attached to the draft agreement but, as in the case of the parties' incomes, had not yet been filled in.

---

*that he has given due consideration to such matters and questions, that he clearly understands and consents to all of the provisions of this Agreement, and that he is entering into this Agreement freely, voluntarily and with full knowledge.*" (Emphasis added.)

[9] Article eleven of the draft agreement provided: "(A) *The Wife represents that her assets and liabilities are substantially as set forth on Schedule 'B' annexed hereto and that her gross income from all sources (excluding capital gains) for 1997 was approximately ____ Dollars.*

"(B) *The Wife acknowledges that she has examined Schedule 'A' annexed hereto which sets forth the Husband's assets and liabilities. She also acknowledges that the Husband's assets and liabilities may increase or decrease.* In addition, she acknowledges that the Husband has informed her that he is a participant in or owner of one or more Plans the present death benefits of which aggregate in excess of ____ Dollars, that such benefits may increase or decrease, that such Plans also have non-death benefits, and that he may also be a participant in or owner of one or more other Plans in the future. *She further acknowledges that she has weighed all of the factors, conditions and circumstances likely to influence her judgment herein, that the provisions of this Agreement have been fully and satisfactorily explained to her and all of her questions pertinent thereto have been fully and satisfactorily answered by counsel of her own selection,* that she is aware that, by executing this Agreement, she is giving up valuable rights in and to the Husband's Property, including, without limitation, all benefits under all present and future Plans resulting from services heretofore or hereafter performed and/or from contributions made principally (as between the parties) by or on behalf of the Husband (except as expressly and voluntarily otherwise provided by the Husband), *that she has given due consideration to such matters and questions, that she clearly understands and consents to all of the provisions of this Agreement, and that she is entering into this Agreement freely, voluntarily and with full knowledge.*" (Emphasis added.)

The plaintiff read the draft agreement over the weekend of November 7 and 8, and made handwritten notes on seven of its twenty-one pages. The notes suggested that she had read the agreement carefully.[10] Among the words that she underlined in article six, which concerned waiver and release of her future rights and claims against the defendant,[11] were "waives," "releases," "rights," "claims," "alimony" and "maintenance . . . ." The plaintiff also completed schedule B, noting that she had no liabilities and that her assets consisted of a "checking account" valued at $4000, a "savings account" valued at $11,000, "shares" valued at $4000, and an "endowment" valued at $3000, for a total asset value of $22,000. The plaintiff made no notations or marks on the draft agreement indicating that she had any questions or concerns regarding article ten, article eleven or schedule A.

[10] The notes reflected the plaintiff's concerns or questions regarding: (1) the statement that each party acknowledged that he or she had substantial assets and would be able to support himself or herself adequately (article one); (2) the omission of a value for benefits to be received by the plaintiff in the event that the defendant predeceased her and they had been married at least thirty years (article four); (3) the stipulation that, if there were surviving children of the marriage, the plaintiff would receive the parties' principal residence upon the defendant's death, subject to any mortgage indebtedness thereon (article four); (4) the source of payment for legal fees required if the plaintiff found it necessary to enforce her rights under the agreement by initiation of a legal proceeding (article four); (5) the manner of dividing jointly held property acquired by gift if the marriage was dissolved (article five); (6) the amount and timing of payments to the plaintiff upon dissolution if the parties had no children (article six); (7) the provision relating to the termination of the defendant's obligation to provide the plaintiff with a residence upon dissolution and the amount of time granted to the plaintiff to vacate the residence (article six); and (8) the requirement that any child of the marriage permanently reside within the United States until his or her eighteenth birthday (article twelve).

[11] Article six of the draft agreement specifically provided in relevant part that "each party waives, disclaims, renounces and releases any and all rights and claims of any kind, nature or description against the earnings and Property of the other party, whether as a distributive award, an award of equitable distribution, alimony, maintenance, support or otherwise . . . ."

When the defendant handed the draft agreement to the plaintiff on November 5, he also told her that his sister-in-law, Attorney Kristen A. Friezo, could recommend an attorney with whom the plaintiff might wish to consult. The plaintiff, who was on good terms with Kristen Friezo, made an appointment to go to her New York City law firm on Tuesday, November 10.[12] Upon the plaintiff's arrival for her appointment, Kristen Friezo introduced her to another associate in the law firm, Attorney Eamonn F. Foley.

Foley first asked the plaintiff to sign a conflict of interest waiver, which she did. The two then met for approximately one-half hour. Because Foley already had a copy of the draft, the plaintiff did not show him her copy.[13] When Foley asked the plaintiff if she had any questions, she posed the questions that had come to mind during her weekend review of the draft. Foley stated that her points were well taken and that he would look into them. During the consultation, Foley also made notes on his own copy of the draft and asked the plaintiff to provide him with a list of her assets.

According to the plaintiff, Foley did not show or discuss with her a facsimile copy of the defendant's assets and liabilities that the defendant's attorney had sent to him on Friday, November 6, one day after the defendant presented the draft to the plaintiff and suggested that she seek legal advice. The document listed assets with a total value of $6,576,000. These assets included two mutual fund/money market accounts, 2541 shares of common stock in Softime, Inc., the West-

---

[12] The plaintiff testified that she could not remember exactly when she had contacted Kristen Friezo but believed it had been over the weekend before the appointment.

[13] The defendant's attorney testified that he had sent a copy of the draft agreement to Kristen Friezo on Tuesday, November 3. Although Kristen Friezo did not discuss the draft agreement with the plaintiff, she apparently gave the agreement to Foley prior to his meeting with the plaintiff.

port property, a Florida property, an automobile, a motorcycle, a boat, a Merrill Lynch employee stock purchase plan, three Bankers Trust employee plans, three Bankers Trust equity participation plans and some United States savings bonds, all of which were identified by account number, where applicable, and valued individually. The only liability indicated was a tax adjustment on the three Bankers Trust equity participation plans. The list of the defendant's assets and liabilities faxed to Foley on November 6 ultimately was incorporated, without revision, into schedule A of the final agreement.[14]

In describing her meeting with Foley, the plaintiff testified that Foley did not ask her whether she understood the draft and did not voluntarily explain any portions of the draft that she did not bring up. She admitted, however, that she understood the meaning of a release of rights and claims and that she knew that the purpose of the agreement was to protect the defendant's assets in the event of a divorce. She also testified that she had not discussed the defendant's income or assets with Foley at any time during their meeting and that it did not matter to her how much money the defendant made either prior to or following their marriage.

---

[14] The plaintiff testified that she had acquired substantial knowledge regarding many of these assets prior to their marriage. She further testified that, in late 1997 or in 1998, the defendant had told her that he was one of the youngest persons ever to have become a partner at Bankers Trust. In her deposition, portions of which were entered into evidence as exhibits for the defense, she also stated that she believed, when she signed the agreement, that the defendant "was at the height of his financial success . . . ." The plaintiff specifically testified that, prior to the marriage, she was aware that the defendant owned a number of substantial assets, including an apartment in New York City, a Florida condominium, a Ford Explorer, and some Bankers Trust stock, and that he owned or leased a new Mercedes Benz and a twenty-eight foot Grady White boat. She also knew that the defendant was prepared to spend between $900,000 and $1.5 million for a house in Connecticut prior to his purchase of the Westport property. In addition, the defendant had told her of his ambition to earn $100 million and retire early.

The plaintiff did not meet with Foley after November 10, but stated that they most likely had another conversation sometime before she signed the agreement, although she did not recall exactly when.[15] Thereafter, Foley faxed his notes regarding the plaintiff's concerns and her list of assets to the defendant's attorney. The plaintiff did not discuss the agreement with the defendant during this period because he was out of the country on business between Sunday, November 8, and Wednesday, November 11.

On November 12, twenty-four hours before the wedding, the parties met in the offices of the defendant's attorney and signed the final agreement. The defendant had faxed the agreement in its final form to Foley earlier that day with no schedules attached. The agreement presented to the plaintiff for signature, however, contained all of the financial information absent from the original draft. This included figures indicating the parties' respective annual incomes and the completed schedules A and B. The plaintiff testified that this was the first time that she had seen a statement of the defendant's assets and liabilities and a figure representing the defendant's income.

The trial court determined that the plaintiff had reviewed the final agreement in a separate room for at least twenty minutes prior to its signing, during which time she "looked at" schedule A and the income provisions.[16] The agreement in its final form contained most

---

[15] The plaintiff testified that Foley had not provided her with a proper explanation of the agreement but that she had made no effort to find another attorney, did not discuss with the defendant a desire to seek another attorney, did not ask the defendant to provide her with money to retain the services of another attorney and had no intention of bringing an action against Foley for malpractice.

[16] On cross-examination, the plaintiff testified that, although she had "looked at" schedule A and "saw" the list of assets in schedule A before she signed the agreement, she could not say with certainty whether she "understood" the defendant's net worth at that time.

of the changes that she had requested during her meeting with Foley two days earlier.[17] Thereafter, both parties signed and initialed the agreement and the attached schedules A and B. Foley did not charge the plaintiff for his services but, following the parties' wedding, the defendant directed the plaintiff to send Foley two bottles of wine as a gesture of gratitude, which the plaintiff did. The defendant paid his own attorney $5000.

The parties married on November 13, 1998. On July 2, 2002, the plaintiff filed for dissolution, claiming an irretrievable breakdown of the marriage. The plaintiff requested equitable distribution of the parties' assets pursuant to General Statutes § 46b-81, alimony, child support, joint legal custody of the parties' minor child, physical custody of the minor child and other relief. The defendant filed an answer and a cross complaint, and the trial court heard testimony and received exhibits during a nine day trial in July and August, 2004. Enforceability of the agreement was among the issues to be decided by the court.

In its memorandum of decision dated August 27, 2004, the trial court concluded that the parties' premarital agreement was unenforceable because the plaintiff had met her burden of proving lack of adequate financial disclosure by the defendant and lack of a reasonable opportunity to consult with independent counsel. The

---

[17] The changes included: (1) deletion of the statement that both parties have substantial assets; (2) a revision providing for satisfaction of the mortgage on the defendant's residence in the event of a divorce; (3) a revised schedule of payments to the plaintiff should the defendant predecease her during the marriage; (4) a provision regarding payment of the plaintiff's attorney's fees should she be required to commence a legal proceeding to enforce the agreement; (5) a revision concerning gifts received by the parties during the marriage; (6) inclusion of a payment provision applicable upon dissolution of the marriage as well as upon the death of the defendant if the parties have no children; and (7) modification of the provision regarding when the plaintiff would be required to vacate the parties' residence if they divorced.

court determined that the plaintiff did not have sufficient time to examine the agreement and did not have actual knowledge regarding the defendant's income or the value of his assets. The court also concluded that Foley had not represented her interests properly or provided her with adequate assistance in understanding the agreement's provisions.[18] Thereafter, the court

[18] The court specifically concluded: "The plaintiff claims that the parties were at [the law offices of the defendant's attorney] for about ten minutes. It took that long to initial and sign original documents. She says that there was no time to review the premarital agreement or the financial pages now attached to it. Foley was not present. The defendant asserts that the parties were at [the law offices] for more than [one] hour. The plaintiff was in a room by herself reviewing the premarital agreement for twenty minutes before the signing took place. [The defendant] says that his attorney telephoned Foley while the parties were there. Foley acknowledged receipt of the final draft and approved of the plaintiff's proceeding with the signing. It does not matter which party has the better recollection of the occasion. Whether the parties were at [the law offices] for one hour, or twice that time, the plaintiff did not have an adequate opportunity to review the premarital agreement, much less understand its changes or digest the lists of assets attached to it.

"The plaintiff had no experience with attorneys except the parties' consultation with the immigration lawyer in August [1998]. She did not know that she was being set up. The premarital agreement in its final form was revised on several of the pages where the plaintiff had raised questions to Foley. It was also revised in one way that the plaintiff had not suggested—the addition of language [providing that] the plaintiff waived any claim of conflict of interest occasioned by the employment of Kristen Friezo's law firm. The plaintiff's execution of documents waiving any claim to conflict of interest does not alter the fact that the attorneys of [Kristen Friezo's law firm] did have a clear conflict of interest. Foley was either incredibly incompetent in his representation of the plaintiff or he was not, in fact, representing her at all. The plaintiff did not have the sophistication to realize what was going on. Perhaps, the most telling indication of Foley's true loyalties and obligations in connection with his lack of advice to the plaintiff was his failure to secure any retainer agreement, exact a consultation fee, or tender any bill for services. After the parties married, the defendant told the plaintiff to deliver two bottles of wine to [Foley] to thank Foley for his help. The plaintiff followed the defendant's instructions. The defendant paid his own attorneys more than $5000 for the preparation of the premarital agreement and advice to the defendant.

"The waivers and concessions in the premarital agreement were not contracted knowingly by the plaintiff. She did not have the benefit of independent legal counsel nor a reasonable opportunity to secure such representation. She did not know the defendant's income or the value of his assets. Despite the cohabitation of the parties for more than four years

relied in part on the net worth of the defendant, as represented in schedule A, in fashioning its financial orders.

## II

## STANDARD OF REVIEW

The trial court concluded that the parties' prenuptial agreement was unenforceable because the defendant did not provide the plaintiff with a "fair and reasonable" disclosure of the amount, character and value of his property, financial obligations and income, and because the plaintiff was not afforded a reasonable opportunity to consult with independent counsel. See General Statutes § 46b-36g (a) (3) and (4). In reviewing these conclusions, we first must determine the meaning of "fair and reasonable" disclosure, a matter of statutory interpretation. It is well established that statutory interpretation involves a question of law over which we exercise plenary review. E.g., *Parrot* v. *Guardian Life Ins. Co. of America*, 273 Conn. 12, 18, 866 A.2d 1273 (2005). We then must determine whether the trial court properly concluded that the agreement was unenforceable. This requires application of the legal standards described in the statute, namely, "fair and reasonable" financial disclosure and "opportunity to consult with independent counsel," to the underlying historical facts. General Statutes § 46b-36g (a) (3) and (4). Accordingly, the defendant's claim that the agreement was enforceable is a mixed question of fact and law also subject to our plenary review. See *Copas* v. *Commissioner of Correc-*

prior to the marriage, the parties kept their finances completely separated. They did not talk of money issues. The plaintiff did not have any financial disclosure prior to the meeting in the offices of the defendant's attorneys when she executed the premarital agreement. The timing of the disclosure rendered it inadequate to provide any possibility of actual knowledge by the plaintiff. . . . The plaintiff has met her burden of proving lack of adequate financial disclosure and lack of a reasonable opportunity to consult with independent counsel. The premarital agreement will not be enforced." (Citation omitted.)

*tion,* 234 Conn. 139, 152–53, 662 A.2d 718 (1995) ("Historical facts constitute a recital of external events and the credibility of their narrators. So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense. . . . [Such questions require] plenary review by this court unfettered by the clearly erroneous standard." [Citations omitted; internal quotation marks omitted.]); see also *Winchester* v. *McCue,* 91 Conn. App. 721, 726, 882 A.2d 143 (claim that prenuptial agreement was unenforceable because both parties failed to disclose income prior to signing presented "mixed question of law and fact [subject] to . . . plenary review"), cert. denied, 276 Conn. 922, 888 A.2d 91 (2005). When legal conclusions of the trial court are challenged on appeal, "we must decide whether [those] . . . conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *State* v. *Colon,* 272 Conn. 106, 282, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

## III

## "FAIR AND REASONABLE" DISCLOSURE[19]

The principles that govern statutory construction are well established. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the

---

[19] Various jurisdictions describe the financial disclosure required as "fair," "full," "full and fair," "full and frank" and "fair and reasonable." (Internal quotation marks omitted.) J. Younger, "Perspectives on Antenuptial Agreements," 40 Rutgers L. Rev. 1059, 1078 (1988). We regard these terms as indistinguishable.

language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Citation omitted; internal quotation marks omitted.) *Cogan* v. *Manhattan Auto Financial Corp.*, 276 Conn. 1, 7, 882 A.2d 597 (2005).

Prenuptial agreements in Connecticut have been governed since October 1, 1995, by the Connecticut Premarital Agreement Act, General Statutes § 46b-36a et seq. General Statutes § 46b-36g (a) provides: "A premarital agreement or amendment shall not be enforceable if the party against whom enforcement is sought proves that: (1) Such party did not execute the agreement voluntarily; or (2) [t]he agreement was unconscionable when it was executed or when enforcement is sought; or (3) [b]efore execution of the agreement, such party was not provided a fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party; or (4) [s]uch party was not afforded a reasonable opportunity to consult with independent counsel."

Although § 46b-36g does not expressly define "fair and reasonable" financial disclosure, a plain reading of the statute indicates that the term was intended to be understood in the context of the phrase that directly follows, namely, "the amount, character and value of

property, financial obligations and income of the other party . . . ." General Statutes § 46b-36g (a) (3). Accordingly, "fair and reasonable" disclosure refers to the nature, extent and accuracy of the information to be disclosed, and not to extraneous factors such as the timing of the disclosure.[20] This conclusion is consistent with the case law of other jurisdictions that have adopted similar requirements. See, e.g., *Randolph* v. *Randolph*, 937 S.W.2d 815, 821 (Tenn. 1996) ("full and fair" financial disclosure refers to requirement that each party reveal extent and nature of assets, liabilities and income to other party prior to execution of agreement). Notably, there is no requirement in the statute that written disclosures be appended to the agreement. In the absence of further guidance as to what constitutes "fair and reasonable" disclosure or how such a disclosure should be made, however, it is necessary to look beyond the statute to extratextual sources, beginning with the legislative history.

During the committee hearings that preceded legislative debate on the proposed bill,[21] Edith F. McClure, an attorney who represented the family law section of the Connecticut Bar Association and who was a member of the committee that drafted the act, explained that the committee had been influenced by three things; see generally Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 1995 Sess., pp. 2237, 2492–93; the first being a 1980 decision of this court, *McHugh* v. *McHugh*, 181 Conn. 482, 436 A.2d 8 (1980), in which we addressed whether a prenuptial agreement was enforceable in a dispute involving the disposition of the family residence. Id., 484–85; see Conn. Joint Standing Committee Hearings, supra, p. 2492. McClure noted that, although *McHugh* was the principal Connecticut decision on pre-

[20] The timing of the agreement is addressed in part IV of this opinion.

[21] House Bill No. 6932 (1995 Sess.) contained the proposed draft of the Connecticut Premarital Agreement Act.

nuptial agreements, it was limited in scope and did not address many other important issues, such as "assets . . . and liabilities brought into the marriage . . . ." Conn. Joint Standing Committee Hearings, supra, pp. 2492–93. McClure also explained that the committee had relied on the Uniform Premarital Agreement Act (uniform act) in drafting the statute but had departed from certain of the uniform act's provisions in light of "the Connecticut experience . . . ." Id., p. 2493. For example, the proposed bill "allow[ed] for an individual to contest an agreement if that individual [was] not provided with fair and reasonable financial disclosure and did not waive that right or have independent knowledge."[22] Id. McClure also revealed that the committee had investigated the statutes and judicial decisions of other jurisdictions and that an article by Professor Judith T. Younger; see generally J. Younger, "Perspectives on Antenuptial Agreements," 40 Rutgers L. Rev. 1059 (1988); had been "particularly helpful in framing recommendations for changes in the [u]niform [a]ct." Conn. Joint Standing Committee Hearings, supra, p. 2493. In her article, Younger conducted an extensive review of existing law and concluded that, "[i]n every case, disclosure should be enough to give each contracting party a clear idea of the other's property and resources. The best device for proving disclosure is to

---

[22] Subsection (a) of § 6 of the uniform act provides: "A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

"(1) that party did not execute the agreement voluntarily; or

"(2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:

"(i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

"(ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

"(iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party." Unif. Premarital Agreement Act § 6 (a), 9C U.L.A. 48–49 (2001).

attach schedules of assets and income to the agreement itself. A mere recital of disclosure in the agreement does not preclude a showing that there was none in fact." J. Younger, supra, 1080.

The bill initially required the party against whom enforcement is sought to prove not only that he or she was not provided a "fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party," but that he or she "[d]id not voluntarily and expressly waive, in writing, any right to disclosure of the property, financial obligations and income of the other party beyond the disclosure provided" and "[d]id not have, or reasonably could not have had, an adequate knowledge of the property, financial obligations and income of the other party, and of the legal rights which that party would relinquish under the agreement . . . ." Substitute House Bill No. 6932, § 6 (1995 Sess.). An amendment, however, eliminated the second and third requirements. See Substitute House Bill No. 6932, § 6 (1995 Sess.), as amended by House Amendment Schedule A. The amendment thus made it easier to prove lack of a "fair and reasonable" financial disclosure and demonstrated the legislature's intent that the disclosure requirement focus on the information to be disclosed rather than on the party to whom disclosure is made.

Although the legislative history is helpful in understanding the drafters' general intent, it does not provide a definitive answer to the question of what constitutes "fair and reasonable" disclosure. It is therefore necessary to review *McHugh*[23] and the decisions of other

[23] *McHugh*, which was decided in 1980, preceded the passage of the Connecticut Premarital Agreement Act by fifteen years and refers to "full disclosure of the amount, character, and value of the parties' respective assets"; *McHugh* v. *McHugh*, supra, 181 Conn. 487; rather than to "fair and reasonable disclosure of the amount, character and value of [the parties'] property, financial obligations and income . . . ." General Statutes § 46b-36g (a) (3). Nevertheless, the decision is helpful in interpreting the statute because the financial disclosure requirements described in *McHugh* and the statute are,

jurisdictions that have interpreted analogous provisions.

In *McHugh*, this court articulated the principle that, because the parties to a prenuptial agreement stand in a relationship of mutual confidence, "[t]he duty of each party to disclose the amount, character, and value of individually owned property, absent the other's independent knowledge of the same, is an essential prerequisite to a valid antenuptial agreement containing a waiver of property rights. . . . The burden is not on either party to inquire, but on each to inform, for it is only by requiring full disclosure of the amount, character, and value of the parties' respective assets that courts can ensure intelligent waiver of the statutory rights involved." (Citations omitted; internal quotation marks omitted.) *McHugh* v. *McHugh*, supra, 181 Conn. 486–87. *McHugh* thus makes three significant points. First, the purpose of disclosure is to ensure that each party has sufficient knowledge of the other party's financial circumstances to understand the nature of the legal rights being waived.[24] See id. In other words, a party cannot know what is being waived unless he or she is privy to all of the relevant facts, in particular,

for all practical purposes, the same. Moreover, as McClure herself explained to the legislature, the proposed statute was intended to clarify *McHugh*, not to supplant the legal principles espoused therein. See Conn. Joint Standing Committee Hearings, supra, p. 2492; see also *Dornemann* v. *Dornemann*, 48 Conn. Sup. 502, 511, 850 A.2d 273 (2004) ("[t]he [Connecticut Premarital Agreement] [A]ct endorses, clarifies and codifies the *McHugh* standards").

[24] These rights, acquired by virtue of the marriage or upon its termination, include claims on the estate of the other party and limitations on alimony and property distribution. See A. Rutkin, K. Hogan & S. Oldham, 8A Connecticut Practice Series: Family Law and Practice with Forms (2d Ed. 2000) § 48.5, pp. 25–26. "[I]t is not sufficient, for example, merely to know what percentage of the estate would be awarded by statute to a surviving spouse who elected to take his or her statutory share rather than whatever alternate provisions may have been made by will or otherwise, unless he or she also knows the nature and extent of the specific estate in which the statutory share is being waived." Id., p. 26.

the financial status of the other party. The term "fair and reasonable" thus refers to the substance of a party's disclosure rather than to its timing. This principle is consistent with the language of § 46b-36g, as we previously discussed. Second, financial disclosure in Connecticut must be understood as a burden to inform borne solely by the disclosing party. Id. Accordingly, the court's examination of whether proper disclosure has been made must focus on the actions of the disclosing party rather than on the party to whom disclosure is made. See id. Third, "full" financial disclosure is required in a prenuptial agreement only if the party to whom disclosure is made does not have independent knowledge of the other party's financial circumstances. See id., 486.

*McHugh* is the only Connecticut case that has examined, even tangentially, the meaning of fair and reasonable disclosure.[25] We therefore turn to the case law of

[25] In two subsequent Connecticut cases, the Appellate Court concluded that the party against whom the agreement was being enforced had independent knowledge of the other party's financial circumstances. In *Wilkes* v. *Wilkes*, 55 Conn. App. 313, 738 A.2d 758 (1999), in which the plaintiff, Beverly Wilkes, claimed that the parties' "mid-nuptial agreement" was invalid because the defendant, Lawrence Wilkes, had not made a "fair and reasonable" disclosure of his assets under § 46b-36g (a) (3); (internal quotation marks omitted) id., 319; the Appellate Court concluded that there was no merit to her claim because she had examined the defendant's financial records at his office, the defendant had given her copies of all documents and records that she had requested, the parties themselves had represented in the agreement that both fully and completely had disclosed their income, assets and liabilities to the other party, and the statute did not require formal financial affidavits. Id., 319–20. The plaintiff thus had independent knowledge of the defendant's financial circumstances.

Thereafter, in *Winchester* v. *McCue*, supra, 91 Conn. App. 721, the Appellate Court considered whether the failure of the parties to include their incomes in a prenuptial agreement signed prior to the enactment of § 46b-36g rendered the agreement invalid and concluded that it did not. See id., 726. The court observed that the plaintiff, Renee Winchester, possessed independent knowledge of the financial circumstances of the defendant, Robert McCue, when the agreement was executed "so as to intelligently waive her right to any income, real or personal property and any claim to alimony." Id., 727. This knowledge was acquired during the parties' three year

other jurisdictions that have enacted similar provisions based on the uniform act. See, e.g., *Connecticut National Bank* v. *Giacomi*, 233 Conn. 304, 326, 659 A.2d 1166 (1995) ("we . . . may find guidance in precedent from other states that have adopted . . . relevant provisions of [a] [u]niform [a]ct"); *Hill* v. *Blake*, 186 Conn. 404, 408, 441 A.2d 841 (1982) ("[when an] act is a uniform law, decisions from other states are valuable for the interpretation of its provisions"); see also *Jacobs* v. *Healey Ford-Subaru, Inc.*, 231 Conn. 707, 719–21, 652 A.2d 496 (1995) (considering interpretations of analogous provisions of article nine of Uniform Commercial Code adopted by other states).

Our review of this case law indicates that when a party's independent knowledge is insufficient and the other party must disclose financial information in a prenuptial agreement, the extent of the required disclosure depends on how the court views the relationship. Courts in the majority of jurisdictions regard the parties as involved in a confidential relationship of mutual trust that demands the exercise of the highest degree of good faith, candor and sincerity in all matters bearing on the proposed agreement. See, e.g., *In re Marriage of Drag*, 326 Ill. App. 3d 1051, 1056, 762 N.E.2d 1111 (2002); *Cannon* v. *Cannon*, 384 Md. 537, 556, 570–71, 865 A.2d 563 (2005); *Rosenberg* v. *Lipnick*, 377 Mass. 666, 670, 389 N.E.2d 385 (1979); *Wiley* v. *Iverson*, 295 Mont. 511, 517, 985 P.2d 1176 (1999); *In re Estate of Hollett*, 150 N.H. 39, 42–43, 834 A.2d 348 (2003); *Tiryakian* v. *Tiryakian*, 91 N.C. App. 128, 132, 370 S.E.2d 852 (1988); *Fletcher* v. *Fletcher*, 68 Ohio St. 3d 464, 466, 628 N.E.2d 1343 (1994); *Griffin* v. *Griffin*, 94 P.3d 96, 99–100 (Okla. App. 2004); *Randolph* v. *Randolph*, supra, 937 S.W.2d

courtship, when they spent considerable time together, shared expenses, vacationed together and thereby became aware of each other's lifestyle and spending habits. Id., 728. Both parties had appended to the agreement a statement listing their assets. Id., 724.

821; *Carpenter* v. *Carpenter*, 19 Va. App. 147, 152, 449 S.E.2d 502 (1994); *Pajak* v. *Pajak*, 182 W. Va. 28, 33, 385 S.E.2d 384 (1989). In these jurisdictions, "[t]he burden is not on either party to inquire, but on each to inform . . . ." *Rosenberg* v. *Lipnick*, supra, 670; accord *DeLorean* v. *DeLorean*, 211 N.J. Super. 432, 440, 511 A.2d 1257 (1986); see also *Denison* v. *Dawes*, 121 Me. 402, 404, 117 A. 314 (1922); *Hartz* v. *Hartz*, 248 Md. 47, 56–57, 234 A.2d 865 (1967); *In re Estate of Kaufmann*, 404 Pa. 131, 136, 171 A.2d 48 (1961).

Jurisdictions that treat the parties as involved in an arm's-length relationship "on the theory that parties who are not yet married are not presumed to share a confidential relationship"; (internal quotation marks omitted) *DeLorean* v. *DeLorean*, supra, 211 N.J. Super. 441, quoting *In re Marriage of Dawley*, 17 Cal. 3d 342, 355, 551 P.2d 323, 131 Cal. Rptr. 3 (1976); impose a duty on each spouse to inquire and investigate the financial condition of the other, and, consequently, the disclosure requirement is less demanding. *DeLorean* v. *DeLorean*, supra, 438;[26] see, e.g., *In re Marriage of Bonds*, 24 Cal. 4th 1, 27, 5 P.3d 815, 99 Cal. Rptr. 2d 252 (2000); *Eckstein* v. *Eckstein*, 129 App. Div. 2d 552, 553, 514 N.Y.S.2d 47 (1987). Connecticut regards the parties to a prenuptial agreement as involved in a confidential relationship. See *McHugh* v. *McHugh*, supra, 181 Conn. 486–87. Accordingly, we must apply the more stringent standard.

The overwhelming majority of jurisdictions that apply this standard do not require financial disclosure to be exact or precise. See, e.g., *Nanini* v. *Nanini*, 166 Ariz. 287, 290, 802 P.2d 438 (App. 1990) (applying Illinois law and concluding that "exact dollar value" of parties' property need not be shown at time of execution of

---

[26] In *DeLorean*, the court noted that New Jersey does not impose such a duty. *DeLorean* v. *DeLorean*, supra, 211 N.J. Super. 438.

agreement); *In re Estate of Lopata*, 641 P.2d 952, 955 (Colo. 1982) ("Fair disclosure is not synonymous with detailed disclosure such as a financial statement of net worth and income. The mere fact that detailed disclosure was not made will not necessarily be sufficient to set aside an otherwise properly executed agreement."); *In re Estate of Peterson*, 221 Neb. 792, 798, 381 N.W.2d 109 (1986) ("[f]air disclosure contemplates that each spouse should be given information, of a general and approximate nature, concerning the net worth of the other" [internal quotation marks omitted]); *Simeone* v. *Simeone*, 525 Pa. 392, 403, 581 A.2d 162 (1990) ("disclosure need not be exact, so long as it is 'full and fair' "); *Sanford* v. *Sanford*, 694 N.W.2d 283, 294–95 (S.D. 2005) ("It is sufficient if the prospective spouse can be said to have had adequate knowledge of the nature and extent of the other party's property. . . . It is not necessary . . . for a spouse to provide a detailed and exact valuation of his or her net worth . . . . It is sufficient for a spouse to provide, within the best of his or her abilities, a list of assets and liabilities with approximate valuations. The listing must be sufficiently precise to give the other spouse a reasonable approximation of the *magnitude* of the other spouse's net worth." [Citations omitted; emphasis added; internal quotation marks omitted.]); *Randolph* v. *Randolph*, supra, 937 S.W.2d 821 (Although "full and fair" disclosure "need not reveal precisely every asset owned by an individual spouse, at a minimum, full and fair disclosure requires that each contracting party be given a clear idea of the nature, extent, and value of the other party's property and resources. . . . Though not required, a fairly simple and effective method of proving disclosure is to attach a net worth schedule of assets, liabilities, and income to the agreement itself." [Citation omitted.]); *Wilson* v. *Moore*, 929 S.W.2d 367, 371 (Tenn. App. 1996) ("[I]n the absence of fraud or overreaching, the inadvertent

failure to disclose an asset or the unintentional under-valuation of an asset will not invalidate a prenuptial agreement as long as the disclosure that was made provides an essentially accurate understanding of the party's financial holdings. The disclosure will be deemed adequate if it imparts an accurate understanding of the nature and extent of a person's property interests."); *Pajak* v. *Pajak*, supra, 182 W. Va. 32 ("for a pre-nuptial agreement to be valid, it is not necessary that both parties execute a detailed, written financial statement such as is required by a bank before making a loan"). See generally annot., "Failure to Disclose Extent of Value of Property Owned As Ground for Avoiding Premarital Contract," 3 A.L.R.5th 394, 413–17, § 2 [a] (1992). We agree with the majority of jurisdictions that a fair and reasonable financial disclosure requires each contracting party to provide the other with a general approximation of their income, assets and liabilities, and that a written schedule appended to the agreement itself, although not absolutely necessary, is the most effective method of satisfying the statutory obligation in most circumstances.

In the present case, the defendant's disclosure was more than adequate to ensure that the plaintiff would be able to make an intelligent waiver of her statutory rights. See *McHugh* v. *McHugh*, supra, 181 Conn. 486–87. Article ten of the agreement provided that the defendant's gross income from all sources for 1997, excluding capital gains, was $2,300,000. In addition, schedule A set forth a list of the defendant's assets and liabilities, most of which were valued individually, for a total net worth of $6,576,000. These assets, as we previously noted, included money market accounts, mutual funds, checking accounts, investments, real and personal property, stocks, various employee and equity participation plans, United States savings bonds, and four fre-

quent flier accounts, all identified by account numbers, where applicable.

Moreover, the plaintiff acknowledged in article eleven of the agreement that she had examined the list of assets and liabilities provided in schedule A and clearly understood and consented to all of the agreement's terms. See footnote 9 of this opinion. Significantly, the plaintiff did not allege at any time during the proceedings, nor did the court conclude, that the defendant's disclosure was inaccurate or incomplete. Instead, the court, in effect, validated the defendant's disclosure by relying in part on the statement of net worth provided in schedule A when calculating its financial orders. Thus, the defendant's disclosure would have been adequate even under the standard employed in New Jersey, which *requires* that a written list of assets and income be appended to the prenuptial agreement. See *DeLorean* v. *DeLorean*, supra, 211 N.J. Super. 438 ("we can ascertain with complete certainty whether there was a full and complete disclosure only by requiring a written list of assets and income [to] be attached to the [ante]nuptial agreement"). We therefore conclude that the defendant's disclosure was "fair and reasonable" because it provided the plaintiff with an accurate representation, in writing, of his income and financial assets at the time the agreement was executed.

The trial court determined that the defendant's disclosure failed to comply with § 46b-36g because the plaintiff lacked sufficient financial experience to understand the information disclosed. This conclusion is incompatible with *McHugh* and the statute's legislative history. When the burden is on each party to inform, as established in *McHugh*, the test for adequate disclosure need not take into account or depend on the capacity of the receiving party to understand or digest the information received. To adopt such a test would place an additional burden on each party to assess the intelligence and

financial experience of the other, a subjective determination simply not contemplated in the statute or in the case law of this or other jurisdictions. Accordingly, although the plaintiff's financial inexperience may be relevant in assessing, for example, whether the agreement was substantively fair; see, e.g., *Banks* v. *Evans*, 347 Ark. 383, 388–89, 64 S.W.3d 746 (2002); unconscionable; see, e.g., *Mallen* v. *Mallen*, 280 Ga. 43, 47, 622 S.E.2d 812 (2005); or voluntary; see, e.g., *DeLorean* v. *DeLorean*, supra, 211 N.J. Super. 436; it is not relevant in determining whether the parties made a "fair and reasonable" disclosure of their respective financial circumstances. The subsequent legislative history of the statute, which included the removal of a provision that would have required the party against whom enforcement is sought to prove that he or she did not have adequate knowledge of the other party's financial status, supports this conclusion. The plaintiff's financial experience, or alleged lack thereof, thus has no bearing on whether the defendant made a fair and reasonable disclosure of his financial circumstances.

IV

VOLUNTARY EXECUTION OF THE AGREEMENT

The trial court further concluded that the defendant had failed to comply with the disclosure requirement because the plaintiff had insufficient time to review the final agreement and the disclosures contained therein. We treat this issue separately because such a conclusion is lacking in legal support and reflects a misunderstanding of the law. It is well established that the amount of time available to review a prenuptial agreement is relevant in assessing whether the agreement was voluntary or signed under duress, but not in determining whether the parties made a "fair and reasonable" disclosure of their financial circumstances. See, e.g., 41 Am. Jur. 2d 102, Husband and Wife § 101

(2005) ("[c]ourts have . . . recognized that under the heightened scrutiny afforded to prenuptial agreements, *the timing of the agreement is of paramount importance in assessing whether it was voluntary*" [emphasis added]); 2 A. Lindey & L. Parley, Separation Agreements and Antenuptial Contracts (2d Ed. 2006) § 110.65 [2], p. 110-54 ("[t]he most common circumstances raised as creating the duress [are] where the party attacking the agreement was given it to sign just before the wedding"); see also *In re Marriage of Bonds*, supra, 24 Cal. 4th 32 (agreement voluntary despite temporal proximity of wedding and execution of agreement); *Hjortaas* v. *McCabe*, 656 So. 2d 168, 170 (Fla. App.) (timing indicated signing of agreement not voluntary and product of duress), review denied, 662 So. 2d 342 (Fla. 1995); *In re Marriage of Maifield*, No. 03-0326, 2004 WL 61108, *2 (Iowa App. January 14, 2004) (agreement not voluntary when presented to wife on eve of wedding); *Howell* v. *Landry*, 96 N.C. App. 516, 528–29, 386 S.E.2d 610 (1989) (brevity of time to consider agreement, by itself, was insufficient to establish duress), review denied, 326 N.C. 482, 392 S.E.2d 90 (1990). The Connecticut legislature, like many other jurisdictions, expressly adopted this principle when it included an entirely separate provision in the statute providing that an agreement shall not be enforceable if the party against whom enforcement is sought establishes that he or she did not execute the agreement voluntarily. General Statutes § 46b-36g (a) (1). If the legislature had intended that the timing of a party's disclosure be considered in determining whether that disclosure was fair and reasonable, there would have been no reason to make involuntary execution of the agreement a separate and distinct ground for invalidation. Consequently, whether the plaintiff had sufficient time to review and evaluate the defendant's financial disclosure reveals nothing about whether the disclosure was fair and reasonable.

We nevertheless consider the disclosure's timing because the trial court's memorandum of decision reasonably can be construed as concluding that the agreement was unenforceable because it was not executed by the plaintiff knowingly and voluntarily. We begin with the decision of the trial court. In reaching its conclusion, the court found that "the plaintiff did not have any financial disclosure prior to the meeting in the offices of the defendant's attorneys when she executed the premarital agreement." We disagree.

The trial court disregarded a crucial piece of evidence in the record pertaining to this issue, namely, the copy of schedule A listing the defendant's assets and liabilities that was faxed to Foley by the defendant's attorney six days before the agreement was executed. Although there is no evidence in the record as to why Foley did not show this information to the plaintiff during their meeting on November 10, the same trial judge observed in *Dornemann* v. *Dornemann*, 48 Conn. Sup. 502, 850 A.2d 273 (2004), with respect to a claim alleging insufficient financial disclosure, that "[t]he knowledge and admissions of an attorney are imputed to his client"; (internal quotation marks omitted) id., 511, quoting *Lafayette Bank & Trust Co.* v. *Aetna Casualty & Surety Co.*, 177 Conn. 137, 140, 411 A.2d 937 (1979); and, therefore, the plaintiff in that case, who had not seen the relevant financial documents, possessed "the imputed knowledge of her attorney as to the defendant's finances . . . ." *Dornemann* v. *Dornemann*, supra, 511; see also *Lebowitz* v. *McPike*, 157 Conn. 235, 242, 253 A.2d 1 (1968); *Sweeney* v. *Pratt*, 70 Conn. 274, 282, 39 A. 182 (1898). Consequently, in the present case, as in *Dornemann*, the plaintiff possessed the imputed knowledge of her attorney regarding the contents of schedule A before she executed the agreement.

There appear to be only two reasons why the trial court did not make a factual finding regarding Foley's

prior knowledge of schedule A, these being the court's expressed conviction that Foley was "incredibly incompetent in his representation of the plaintiff or he was not, in fact, representing her at all." We believe that the latter is the more likely explanation because incompetence is an insufficient reason to avoid imputing knowledge to the plaintiff, who could have sought appropriate legal redress by filing a malpractice claim against Foley but did not do so. Moreover, various statements in the trial court's opinion suggest that the court regarded Foley's conduct as rising to the level of fraud. At different times in its analysis, the court stated that (1) the plaintiff "did not know that she was being set up," (2) the attorneys at Foley's law firm had "a clear conflict of interest" in their representation of the plaintiff, even though the plaintiff executed documents waiving any conflict of interest, (3) the plaintiff "did not have the sophistication to realize what was going on," and (4) "the most telling indication of Foley's true loyalties and obligations in connection with his lack of advice to the plaintiff was his failure to secure any retainer agreement, exact a consultation fee or tender any bill for services." The court's conclusions regarding fraud, however, are not supported by facts that meet the clear and convincing standard of proof required in cases involving charges of fraud and ethical violations by attorneys. E.g., *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 163, 681 A.2d 293 (1996) ("the appropriate standard of proof for the party who seeks to prevail in a civil fraud action is clear and convincing evidence"); *Weiss* v. *Statewide Grievance Committee*, 227 Conn. 802, 812, 633 A.2d 282 (1993) ("in a grievance proceeding, the standard of proof applicable in determining whether an attorney has violated the Code of Professional Responsibility is clear and convincing evidence").

To the extent that the court's determination of misconduct represents a finding that *the defendant* perpe-

trated a fraud on the plaintiff, that finding clearly was improper. Because the plaintiff did not plead a defense of fraud in response to the defendant's cross petition to enforce the prenuptial agreement, she would not be entitled to a judgment premised on that defense *even if* the evidence had supported such a defense, which clearly it did not. See, e.g., *Travelers Ins. Co. v. Namerow*, 257 Conn. 812, 825, 778 A.2d 168 (2001) (fraud is affirmative defense that must be pleaded); *DeLucia v. Valente*, 83 Conn. 107, 109, 75 A. 150 (1910) ("[t]he fact that the court heard evidence upon the question of fraud, considered it, and made a finding in relation to this subject, did not give the appellant the right to rely upon the special defense which had not been pleaded").

Insofar as the trial court found that *Foley* had perpetrated a fraud on the plaintiff, that finding, too, lacks evidentiary support. Indeed, there was no evidence presented at trial to indicate that Foley *knew* the defendant, or even that he had conspired with him, or with anyone else, for that matter, to perpetrate a fraud on the plaintiff. Nor was there any evidence that Kristen Friezo discussed the prenuptial agreement with Foley or attempted to influence him in any way on behalf of the defendant. The only reasonable inference that can be drawn from the evidence is that Foley agreed to represent the plaintiff as a professional courtesy to his colleague, Kristen Friezo, who, apparently, thought that she was doing a favor for the plaintiff.[27]

The trial court's principal factual findings on the issue of fraud were that Foley worked in the same law firm

---

[27] We note that Foley managed to negotiate an additional $2 million for the plaintiff in the event that she remained married to the defendant for thirty years. Although this might not have seemed like much of a bargain to the trial court, it clearly was to the plaintiff, who had requested the additional money and who, more importantly, could have elected to remain unmarried to the defendant had she been unsatisfied with the terms of the agreement.

as Kristen Friezo, did not explain to the plaintiff terminology or provisions in the draft that she herself did not bring to his attention, did not ask the plaintiff if she understood specific provisions in the draft, did not meet with or talk to the plaintiff after their meeting on November 10, did not review with the plaintiff the final revisions to the draft or the defendant's financial disclosure and did not secure a retainer agreement, obtain a consultation fee or tender a bill for his services. Although most of these findings might suggest incompetence, which would support a claim of malpractice, none suggests fraud. In addition, the trial court's finding that Foley did not talk to the plaintiff after their meeting is not supported by the plaintiff's own testimony, in which she stated that she probably had spoken to Foley after their meeting and before she signed the agreement but could not recall when. Finally, insofar as the court may have relied on nonpayment for services as a reason to find that Foley was disloyal to the plaintiff, there is no evidence in the record even remotely suggesting that Foley rendered his services to the plaintiff because he was working secretly for the defendant and intended to subvert her case. Accordingly, the trial court's omission of a finding that Foley had knowledge of schedule A when he met with the plaintiff, apparently on the ground that he had engaged in fraud even though the record lacks clear and convincing evidence of fraud, severely undermines its subsequent conclusion that the plaintiff did not have sufficient time in which to review the agreement and the information contained therein regarding the defendant's financial circumstances.

Even if Foley's knowledge of schedule A is not imputed to the plaintiff, the record establishes, unequivocally, that the plaintiff had actual knowledge of the defendant's financial circumstances when she signed the agreement. The plaintiff conceded that she had "looked at" the entire document, including schedule A

and the income provisions, prior to its execution. In addition, the trial court noted the defendant's testimony that his attorney had telephoned Foley while the parties were meeting to sign the agreement and that Foley had acknowledged receipt of the final draft and approved of the plaintiff's execution thereof. To the extent that the plaintiff may not have read the financial disclosure provisions *carefully*, perhaps it was because, by her own admission, *she had no interest* in discussing financial matters with the defendant during the time that they lived together prior to the marriage and *it did not matter to her how much money the defendant had* at the time they were married. Moreover, the plaintiff testified that, during the meeting she attended to sign the final agreement, she was in a hurry to get to a hair appointment. That being the case, her claim that she did not have sufficient time to review the defendant's financial disclosure lacks merit.

The trial court's conclusion that the plaintiff had insufficient time to digest and understand the disclosure on the day she signed the agreement is also unsupportable because it is the party's responsibility to delay the signing of an agreement that is not understood. See, e.g., *Simeone* v. *Simeone*, supra, 525 Pa. 400 ("[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains"); *Standard Venetian Blind Co.* v. *American Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563 (1983) (failure to read contract does not warrant "avoidance, modification or nullification" of its provisions). In the present case, the plaintiff had the opportunity to read the agreement carefully and has not claimed duress. In fact, the trial court specifically observed that there was "no sign" of duress.[28] If the plaintiff felt she did not have sufficient

---

[28] As counsel for the parties were presenting their final arguments, the trial court stated to the defendant's counsel: "I don't feel that [the plaintiff]

time to understand the agreement's terms, she could have rescheduled the wedding, which did not involve extensive planning, for a later date. A formal wedding ceremony to which families and friends would be invited was scheduled for the following July. The only other persons expected to attend the November ceremony were the justice of the peace and his wife, and the plaintiff testified that the wedding could have been rescheduled for any date prior to the end of November without jeopardizing her immigration status. The date had been postponed at least once before, and another delay would not have resulted in embarrassment or humiliation. Thus, the plaintiff could have declined to sign the agreement and requested additional time to review it. The plaintiff should not now be allowed to claim that the agreement is unenforceable and take advantage of her failure to seek a delay in its signing when she easily could have obtained the additional time she claims was needed to review the income and disclosure provisions. For all of the foregoing reasons, we cannot subscribe to the trial court's conclusion that the plaintiff had insufficient time to review the defendant's financial disclosure.

Insofar as the trial court concludes that the plaintiff lacked the financial experience necessary to understand the agreement and thus did not sign it knowingly; see, e.g., *In re Marriage of Gonzalez*, 561 N.W.2d 94, 97 (Iowa App. 1997) (prenuptial agreement invalid for lack of knowing and voluntary waiver because wife did not understand agreement); we also disagree. The notion that the plaintiff was financially unsophisticated merely because she possessed no more than a high school education, was not familiar with Connecticut law on marriage and divorce and did not discuss financial issues with the defendant prior to their marriage

was, in any way, under duress, and I agree with your argument there—that there's no sign of any ultimatum or coercion from [the defendant]."

is unsupported by the record. The fact that the plaintiff did not have a college degree conveys nothing about her ability to understand the agreement. The record indicates that, during her employment as a trader's assistant with Bankers Trust, the plaintiff's work provided her with extensive exposure to financial matters, including entering and recording stock transactions on a daily basis, submitting the defendant's expense account, receipts and bills to the company and photocopying some of his personal financial records to give to his accountant.

The record also indicates that the plaintiff demonstrated excellent judgment in conducting her personal financial affairs. She saved significant portions of her salary and was responsible for all of her own expenses, excluding housing and utilities, while living with the defendant. She had established separate savings and checking accounts, owned 580 shares of stock, invested $3000 in an endowment policy and had incurred no debt. Her total net worth was $22,000 at the time of the marriage. It is therefore clear that the plaintiff knew how to save, invest and manage her own money.

Additionally, we do not believe that parties require a detailed understanding of Connecticut law on marriage and divorce to validly waive their statutory rights in a prenuptial agreement, nor is it necessary to have a college degree in order to understand the concept of net worth. In the present case, the plaintiff herself applied the practical financial skills that she had acquired as a working woman when she filled out schedule B, apparently without assistance. The plaintiff thus knew exactly what the schedules were intended to describe and was aware that the defendant would be completing schedule A in similar fashion. Moreover, the plaintiff testified that she understood the meaning of a "release" of rights and claims and that she knew that the purpose of the agreement was to protect the defendant's assets

in the event of a divorce. She had reviewed the draft given to her by the defendant and made notes and marks on seven of its pages, thus indicating that she had read the document carefully and understood the marked provisions well enough to ask her attorney about specific items several days later, including the underlined language in article six regarding the release and waiver of her rights and claims to alimony and maintenance. Furthermore, she had the advice of counsel and used her meeting with Foley to seek answers to her questions. Foley, in turn, passed her comments on to the defendant's attorney and obtained most of the revisions she had requested. It simply defies reason to conclude that the plaintiff was so lacking in financial experience that she did not understand the rights she was waiving or the defendant's financial disclosure.

At least one jurisdiction has explicitly noted that the time has come for paternalistic presumptions and protections to be discarded. See *Simeone* v. *Simeone*, supra, 525 Pa. 399 (presumption that women not knowledgeable enough to understand nature of contracts they enter is no longer valid). The Supreme Court of Pennsylvania stated more than one decade ago that "[s]ociety has advanced . . . to the point where women are no longer regarded as the 'weaker' party in marriage, or in society generally. Indeed, the stereotype that women serve as homemakers while men work as breadwinners is no longer viable. Quite often today both spouses are income earners. Nor is there viability in the presumption that women are uninformed, uneducated, and readily subject to unfair advantage in marital agreements. Indeed, women nowadays quite often have substantial education, financial awareness, income, and assets.

"Accordingly . . . [p]aternalistic presumptions and protections that arose to shelter women from the inferiorities and incapacities which they were perceived as

having in earlier times have, appropriately, been discarded. . . . It would be inconsistent, therefore, to perpetuate the standards governing prenuptial agreements that . . . [reflect] a paternalistic approach that is now insupportable." (Citations omitted.) Id.

In the present case, the trial court ignores facts in the record that portray the plaintiff, a woman who supported herself for several years by working in a business involving sophisticated financial transactions, as knowledgeable, experienced and even savvy in practical financial matters, and thus able to understand, interpret and ask intelligent questions about the prenuptial agreement if she had so desired. In fact, her written notations on the draft agreement indicate that she had a sharp and inquiring mind. Accordingly, in considering the record in its totality, we conclude that it does not support the conclusion that the plaintiff was so lacking in financial experience or sophistication that she did not execute the agreement knowingly and voluntarily.

V

INDEPENDENT COUNSEL

The trial court concluded that the plaintiff was not afforded a reasonable opportunity to consult with independent counsel as required by § 46b-36g (a) (4). The court based this conclusion on findings that the plaintiff had been "set up" and that her "execution of documents waiving any claim to [a] conflict of interest [did] not alter the fact that the attorneys of [Kristen Friezo's law firm] did have a clear conflict of interest." The trial court further found that "Foley was either incredibly incompetent in his representation of the plaintiff or he was not, in fact, representing her at all." The court added that "[t]he plaintiff did not have the sophistication to realize what was going on" and that "the most telling indication of Foley's true loyalties and obligations in connection with his lack of advice to the plain-

tiff was his failure to secure any retainer agreement, exact a consultation fee, or tender any bill for services." The court thus concluded that the plaintiff "did not have the benefit of independent legal counsel nor a reasonable opportunity to secure such representation." We disagree with the trial court's conclusions because they are premised on a misunderstanding of the statutory requirement.

General Statutes § 46b-36g (a) (4) specifically provides that the party against whom enforcement of the prenuptial agreement is sought must prove that "[s]uch party was not afforded a reasonable opportunity to consult with independent counsel." The operative terms for the purpose of this analysis are "reasonable opportunity" and "independent counsel." Although this court has not yet had occasion to construe § 46b-36g (a) (4), appellate courts that have interpreted identical statutory language invariably have held, consistent with the plain statutory wording, that a "reasonable opportunity to consult with independent counsel" means simply that the party against whom enforcement is sought must have had sufficient time before the marriage to consult with an attorney other than the attorney representing the party's future spouse.

With respect to whether the plaintiff had a "reasonable opportunity" to consult with legal counsel, there is no requirement that a party actually seek or obtain the advice of counsel, only that he or she be afforded a *reasonable opportunity* to do so. See, e.g., *Cannon* v. *Cannon*, supra, 384 Md. 578 (upholding prenuptial agreement when wife had several days to review agreement and, therefore, sufficient time to consult counsel had she been so inclined); id. ("[i]t was enough for [the husband] to demonstrate that [the wife] had the opportunity to seek counsel and that she was not discouraged to do so"); *Black* v. *Powers*, 48 Va. App. 113, 141, 628 S.E.2d 546 (2006) ("the fact that [the wife]

may have failed to seek independent legal advice does not negate her opportunity to do so"); *Pajak* v. *Pajak,* supra, 182 W. Va. 32–33 ("although advice of independent counsel at the time parties enter into a pre-nuptial agreement helps demonstrate that there has been no fraud, duress or misrepresentation, and that the agreement was entered into knowledgeably and voluntarily, such independent advice of counsel is not a prerequisite to enforceability when the terms of the agreement are understandable to a reasonably intelligent adult and both parties have had the *opportunity* to consult with independent counsel" [emphasis in original; internal quotation marks omitted]). In the present case, not only did the plaintiff have a reasonable opportunity to consult with legal counsel, she did, in fact, do so. The defendant did not surprise the plaintiff with a prenuptial agreement the day before the wedding, thus precluding her, for all practical purposes, from obtaining the advice of counsel but, rather, informed the plaintiff that he wanted her to sign an agreement shortly after he proposed marriage on August 20, 1998, more than two months in advance of the anticipated ceremony. Moreover, the plaintiff subsequently contacted Kristen Friezo, who introduced her to Foley. We therefore conclude that the plaintiff had a "reasonable opportunity" to consult with independent counsel as that term is used in § 46b-36g (a) (4).

With respect to whether Foley was in fact "independent" of the defendant, there is absolutely nothing in the record, other than the trial court's conclusory allegations of fraudulent misconduct; see part III of this opinion; to suggest that Foley was not independent. The fact that Foley's colleague, Kristen Friezo, was the defendant's sister-in-law is insufficient to support the trial court's conclusion that Foley was not independent from the defendant within the meaning of § 46b-36g (a) (4). Rule 1.8 (i) of the Rules of Professional Conduct

provides that "[a] lawyer related to another lawyer as parent, child, sibling or spouse shall not represent a client in a representation directly adverse to a person who the lawyer knows is represented by the other lawyer except upon consent by the client after consultation regarding the relationship." Moreover, the commentary to rule 1.8 (i) expressly provides that the disqualification identified therein "is personal and is not imputed to members of firms with whom the lawyers are associated." Rules of Professional Conduct 1.8 (i), commentary. Thus, under our rules governing the conduct of attorneys, Foley was not barred from representing the plaintiff. Moreover, even if he were prohibited from representing her, the trial court failed to explain why the waiver that the plaintiff signed was ineffective, and the record is devoid of facts to support a finding that the plaintiff's waiver, even if necessary, was invalid. For the foregoing reasons, we conclude that the trial court's decision to invalidate the parties' prenuptial agreement under § 46b-36g (a) (3) and (4) cannot stand, and that the agreement must be enforced and the assets distributed according to its terms.[29]

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion SULLIVAN, C. J., and BORDEN, KATZ, PALMER and VERTEFEUILLE, Js., concurred.

NORCOTT, J., dissenting. I disagree with the majority's conclusion that the trial court improperly determined that the parties' prenuptial agreement (agreement) was unenforceable. I also conclude that the trial court improperly presumed that the parties were entitled to an equal distribution of the marital property. Accordingly, I respectfully dissent, and would

---

[29] Because we conclude that the prenuptial agreement is enforceable, we do not reach the defendant's remaining claims.

reverse the judgment of the trial court only with regard to the financial orders.

I

Like the majority, I begin with the first claim of the defendant, David Friezo, namely, that the trial court improperly concluded that the agreement executed by the parties on November 12, 1998, was unenforceable. I do so because, if enforceable, the agreement would have controlled the financial disposition of the case. Under the agreement, the recovery of the plaintiff, Victoria Wood Friezo, would have been limited to $400,000, plus the use of a residence for herself and the parties' child.[1] The trial court found, however, that the plaintiff had not been afforded fair and reasonable financial disclosure prior to executing the agreement. The trial court further found that the plaintiff's attorney, Eamonn Foley, had acted under a "clear conflict of interest" and had failed to offer independent advice. Accordingly, it concluded that the agreement was unenforceable pursuant to General Statutes § 46b-36g (a) (3) and (4). As I outline in the discussion that follows, I disagree with the standard of review that the majority applies to this claim. I further conclude that the trial court properly determined that the agreement was unenforceable.

Generally, "[a]n antenuptial agreement is a type of contract and must, therefore, comply with ordinary

[1] The agreement provided that, in the event the marriage ended in divorce, in addition to providing a residence for the plaintiff and the parties' child, the defendant would pay to the plaintiff an amount corresponding to the length of the period in which the parties lived together as husband and wife, set forth as follows: "If the [p]eriod is less than 2 full years, the sum of $150,000 . . . If the [p]eriod is 2 years or more, but less than 4 full years, the sum of $300,000 . . . If the [p]eriod is 4 years or more, but less than 6 full years, the sum of $400,000 . . . If the [p]eriod is 6 years or more, but less than 8 full years, the sum of $650,000 . . . If the [p]eriod is 8 years or more, but less than 10 full years, the sum of $850,000 . . . If the [p]eriod is 10 years or more, the sum shall be $1,000,000, plus $200,000 for each two full years in excess of 10 years, not to exceed the sum of $3,000,000 for 30 full years."

principles of contract law." *McHugh* v. *McHugh*, 181 Conn. 482, 486, 436 A.2d 8 (1980). The enforceability of such agreements is, however, governed by § 46b-36g,[2] which previously has not been the subject of an appellate level decision in this state.

I begin by setting forth the applicable standard of review, which "depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, 269 Conn. 120, 149, 848 A.2d 451 (2004).

---

[2] The majority opinion provides only the text of § 46b-36g (a). See parts III and IV of the majority opinion. I believe that the remainder of § 46b-36g, particularly subsection (c), sheds light on the appropriate standard of review. The full text of General Statutes § 46b-36g provides: "(a) A premarital agreement or amendment shall not be enforceable if the party against whom enforcement is sought proves that:

"(1) Such party did not execute the agreement voluntarily; or

"(2) The agreement was unconscionable when it was executed or when enforcement is sought; or

"(3) Before execution of the agreement, such party was not provided a fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party; or

"(4) Such party was not afforded a reasonable opportunity to consult with independent counsel.

"(b) If a provision of a premarital agreement modifies or eliminates spousal support and such modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid such eligibility.

"(c) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law."

I disagree with the majority's conclusion that this appeal is subject to plenary review because the meaning of "fair and reasonable disclosure" under § 46b-36g (a) (3) is one of statutory interpretation and "the defendant's claim that the agreement was enforceable is a mixed question of fact and law . . . ." Rather, my review of the text and structure of the statute itself indicates that the trial court's conclusions under § 46b-36g (a) (3) and (4) were factual findings subject to review only for clear error. Section 46b-36g (a) lists four bases for finding a prenuptial agreement to be unenforceable: (1) voluntariness; (2) unconscionability; (3) failure to provide a fair and reasonable disclosure of property, financial obligations and income; and (4) lack of reasonable opportunity to consult with independent counsel. In § 46b-36g (c), the legislature provides, in accordance with our jurisprudence, that "[a]n issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law." The statute is, however, silent with regards to the other three circumstances in which a prenuptial agreement shall not be enforced. By negative implication, this silence indicates that the legislature intended that inquiries under the other provisions of the statute be decided as factual rather than legal questions, which also would be consistent with our case law in effect when the statute was enacted. See *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 580, 657 A.2d 212 (1995) (citing cases from variety of contexts since 1980 wherein "[w]e have consistently held that reasonableness is a question of fact for the trier to determine based on all of the circumstances"); see also, e.g., *Alvarez* v. *New Haven Register, Inc.*, 249 Conn. 709, 722, 735 A.2d 306 (1999) ("[t]he legislature is presumed to be aware of this court's decisions"); *State* v. *Kyles*, 169 Conn. 438, 442, 363 A.2d 97 (1975) ("it must be presumed that the legislature was aware of prior judicial decisions"). There-

fore, in reviewing whether the trial court properly determined that the plaintiff was not (1) "provided a fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party"; General Statutes § 46b-36g (a) (3); and (2) "afforded a reasonable opportunity to consult with independent counsel"; General Statutes § 46b-36g (a) (4); this court is reviewing questions of fact and must apply the clearly erroneous standard. See, e.g., *In re Marriage of Adams*, 240 Kan. 315, 320, 729 P.2d 1151 (1986) (deferring to trial court's finding that wife received advice from independent counsel); see also *Williams Ford, Inc.* v. *Hartford Courant Co.*, supra, 580 ("reasonableness is a question of fact for the trier to determine based on all of the circumstances"); *Weiss* v. *Statewide Grievance Committee*, 227 Conn. 802, 812, 633 A.2d 282 (1993) (statewide grievance committee's determination that conflict of interest had existed was factual finding subject to review for clear error).

I turn first to the trial court's finding, pursuant to § 46b-36g (a) (3), that the plaintiff "was not provided a fair and reasonable disclosure of the amount, character and value of property, financial obligations, and income of the [defendant] . . . ." As the majority acknowledges, § 46b-36g does not define the term "fair and reasonable disclosure." Although § 46b-36g is derived from § 6 of the Uniform Premarital Agreement Act (uniform act),[3] it also is largely a codification of the princi-

___

[3] The majority opinion provides only the text of subsection (a) of § 6 of the uniform act. See footnote 22 of the majority opinion. I believe that the remainder of the section, and particularly subsection (c), is relevant to determining the applicable standard of review. Section 6 of the uniform act provides: "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

"(1) that party did not execute the agreement voluntarily; or

"(2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:

"(i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

"(ii) did not voluntarily and expressly waive, in writing, any right to

ples set forth in *McHugh* v. *McHugh*, supra, 181 Conn. 482. Compare General Statutes § 46b-36g (a) ("[a] premarital agreement . . . shall not be enforceable if the party against whom enforcement is sought proves that . . . [1] [s]uch party did not execute the agreement voluntarily; or . . . [3] [b]efore execution of the agreement, such party was not provided a fair and reasonable disclosure of the amount, character and value of [the other parties assets and liabilities]") with *McHugh* v. *McHugh*, supra, 486 ("To determine whether an antenuptial agreement relating to property was valid when made, courts will inquire whether any waiver of statutory or common-law rights, or the right to a judicial determination in any matter, was voluntary and knowing. . . . The duty of each party to disclose the amount, character, and value of individually owned property . . . is an essential prerequisite to a valid antenuptial agreement containing a waiver of property rights." [Citations omitted.]); see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 1995 Sess., p. 2492, written statement of Edith McClure, representative of Connecticut Bar Association ("[§ 46b-36g] is further intended to clarify the level of financial disclosure between parties and to [overcome] limitations in the scope of the major [Connecticut] [c]ourt decision on [p]remarital [a]greements, *McHugh* v. *McHugh* [supra,

---

disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

"(iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

"(b) If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.

"(c) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law."

487]").[4] *McHugh* itself, however, also does not define the term "fair and reasonable disclosure," as the majority also acknowledges.

"When a statute does not define a term, it is appropriate to look to the common understanding expressed in the law . . . ." *State Medical Society* v. *Board of Examiners in Podiatry*, 208 Conn. 709, 721, 546 A.2d 830 (1988). Despite the lack of definition in this context, the terms "fair" and "reasonable" are familiar to our jurisprudence.[5] For example, we have, in the context

---

[4] I note that the genealogy and history of § 46b-36g illustrate the importance the legislature assigned to the disclosure of pertinent financial information. In its original proposed form, § 46b-36g provided in relevant part: "A premarital agreement or amendment shall not be enforceable if the party against whom enforcement is sought proves that . . .

"(3) Before execution of the agreement, such party: (A) Was not provided a fair and reasonable disclosure of the amount, character, and value of property, financial obligations and income of the other party; *and* (B) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property, financial obligations and income of the other party beyond the disclosure provided; *and* (C) Did not have, or reasonably could not have had, an adequate knowledge of the property, financial obligations and income of the other party, and of the legal rights which that party would relinquish under the agreement . . . ." (Emphasis added.) Substitute House Bill No. 6932, § 6 (a) (3). Clearly, the conjunctive test set forth in the original version of § 46b-36g required that a divorcing spouse prove two elements in addition to unfair or unreasonable financial disclosure, namely, both lack of a written waiver of financial disclosure, which the prudent drafter always would include in the agreement, and lack of actual knowledge of the other spouse's finances. The statute as enacted, which requires only that a spouse demonstrate that he or she was not provided fair and reasonable financial disclosure, is not nearly so onerous.

[5] The majority acknowledges the lack of definition in this context, and then proceeds directly to the case law of sister jurisdictions that have enacted similar provisions based on the uniform act. Although ordinarily it may be proper to turn to such decisions; see *Hill* v. *Blake*, 186 Conn. 404, 408, 441 A.2d 841 (1982) ("[when an] act is a uniform law, decisions from other states are valuable for the interpretation of its provisions"); I do not find it proper in this instance, wherein our legislature has adopted a modified version of the uniform act.

I acknowledge that, when analyzing claims of unfair financial disclosure, sister state courts often have confined their inquiry to whether the information disclosed was accurate, rather than the circumstances under which it was made available. See, e.g., *In re Estate of Lopata*, 641 P.2d 952, 955

of the removal of the chairman of a municipal board of education, stated: "What constitutes reasonable notice in any given legal context depends on the facts and circumstances of the case . . . including the purpose for which the notice is required." (Citation omitted; internal quotation marks omitted.) *LaPointe* v. *Board of Education*, 274 Conn. 806, 814, 878 A.2d 1154 (2005); see also *Cahn* v. *Cahn*, 225 Conn. 666, 674, 626 A.2d 296 (1993) ("[w]hat is reasonable notice [for the purposes of a deposition] must depend largely upon the facts and circumstances of each case" [internal quotation marks omitted]); *E. M. Loew's Enterprises, Inc.* v. *Surabian*, 146 Conn. 608, 612, 153 A.2d 463 (1959) (" '[r]easonable' is a relative term which varies in the context in which it is used, and its meaning may be affected by the facts of the particular controversy"). In this particular context, we have noted that, "[u]nder ordinary circumstances, parties to an ante-nuptial agreement do not deal at arm's length; they stand in a relationship of mutual confidence that calls for the exercise of good faith, candor and sincerity in all matters bearing upon the agreement." (Internal quotation marks omitted.) *McHugh* v. *McHugh*, supra, 181 Conn.

(Colo. 1982) ("[f]air disclosure contemplates that each spouse should be given information, of a general and approximate nature, concerning the net worth of the other"); *Darr* v. *Darr*, 950 S.W.2d 867, 870–71 (Mo. App. 1997) (analyzing mathematical accuracy of disclosure); *In re Estate of Hartman*, 399 Pa. Super. 386, 390–91, 582 A.2d 648 (1990) (fair and reasonable disclosure provision refers to accurate portrayal of net worth and information on applicable statutory rights). This distinction, however, largely appears to have been necessitated by the structure of the uniform act, § 6 (a), which, unlike § 46b-36g, explicitly requires that a party demonstrate both unconscionability *and* unreasonable financial disclosure. Compare footnote 2 of this opinion with footnote 3 of this opinion. Accordingly, the bulk of the factors that I otherwise would consider as part of an inquiry into the reasonableness of financial disclosure must, necessarily, be considered by other jurisdictions in the evaluation of unconscionability. I conclude to the contrary that, as I have explained, our statute, by separately mandating fair and reasonable disclosure of financial information, requires a much more fact sensitive inquiry, going beyond the facial accuracy of the disclosure.

487; cf. *Weinstein* v. *Weinstein*, 275 Conn. 671, 686, 882 A.2d 53 (2005) (describing long-standing policy of requiring detailed financial disclosure to trial court in dissolution of marriage cases). Accordingly, the trial court's assessment of the fairness and reasonableness of the disclosure necessarily incorporated an evaluation of the statutory criteria in light of all the relevant circumstances, including: (1) the level of the plaintiff's financial sophistication; (2) the complexity of the disclosed information; and (3) the time that the plaintiff had to consider the disclosed information. I now consider the defendant's disclosure of the three statutorily mandated types of information, namely, his: "[1] property, [2] financial obligations and [3] income . . . ." General Statutes § 46b-36g (a) (3).

The financial disclosure document attached to the agreement lists several assets that purportedly comprised the defendant's property. It does so, however, in cursory terms that fail to describe the nature of the property in any way whatsoever. As the trial court noted, the disclosure document simply lists thirty-one ambiguously labeled assets, giving no indication of how they were valued or, in some cases, what they truly are. For example, the disclosure document, which indicates the value of the defendant's holdings in "ESTIMATED VALUE (000's)," lists, inter alia, the following assets of the defendant: "Ornstein Leyton Reality, Inc. Real Estate Venture," to which is assigned a value of "85," and "Rosehill Capital Management Rosehill Japan Fund L.P.," to which is assigned a value of "350." Similarly, under the broad category of "Bankers Trust Co. Employee Plans," the defendant's disclosure document lists three assets totaling "430" without explaining what those assets, which are labeled "BT Partnershare Account," "BT Coinvestment Plan" and "BT Partnership Equity Plan," actually constitute. The disclosure document is similarly vague with regard to the defendant's

liabilities. Indeed, the only liability listed by the defendant was "Less Tax (40%)" in the amount of "578" under the heading "BT Equity Participation Plan."

Furthermore, although the final agreement signed by the plaintiff listed the defendant's income for the year 1997 as $2,300,000, the draft agreement and the defendant's financial disclosure document that had been received by the plaintiff's attorney on November 6, 1998, did not contain *any* statement regarding the defendant's income. Additionally, the income stated on the final agreement was not itemized, and provided the plaintiff with no way of assessing its source or consistency. To the extent that the agreement can be construed as having disclosed the defendant's income, it did so only twenty-four hours before the wedding took place, leaving the plaintiff little time to evaluate that disclosure or take any other action to protect her interest.[6]

Additionally, the trial court made significant findings regarding the plaintiff's financial inexperience.[7] Specifi-

[6] As the majority indicates in part IV of its opinion, the trial court was not entirely clear in its reasons for invalidating the agreement. Although the trial court specifically quoted from the language of subdivisions (3) and (4) of § 46b-36g (a), it also stated that the plaintiff did not "knowingly" waive her rights based on the "timing of the [defendant's] disclosure" of his finances. I agree that this language suggests that the trial court also considered the voluntariness of the plaintiff's signature on the agreement in holding it to be unenforceable.

I disagree, however, with the majority's conclusion that the trial court improperly considered the timing of the signing of the agreement when it performed an analysis under § 46b-36g (a) (3). The majority states that "[i]t is well established that the amount of time available to review a prenuptial agreement is relevant in assessing whether the agreement was voluntary, or signed under duress, but not in determining whether the parties made a 'fair and reasonable' disclosure of their financial circumstances." Although § 46b-36g (a) lists four reasons for invalidating a premarital agreement, I decline to read the subdivisions of the statute as mutually exclusive, in the sense that facts relevant to one inquiry cannot also be relevant to the others. Rather, I note that in many situations, the subdivisions of § 46b-36g (a) may overlap, so that facts relevant to one will also be relevant to others.

[7] I agree with the majority's statement that "the time has come for paternalistic presumptions and protections to be discarded." Indeed, the plaintiff's

cally, the trial court found that the plaintiff possessed only a high school education, "had no knowledge of Connecticut marriage and divorce laws, inheritance rights, spousal share upon death, forms of joint or sole real property ownership, qualified domestic relations orders, tax-deferred annuities, individual retirement plans, etc." The trial court further found that the parties "kept their finances completely separated," and "did not talk of money issues." I acknowledge that the plaintiff is charged with knowledge of the financial information sent to her attorney on November 6, 1998. See *Lafayette Bank & Trust Co.* v. *Aetna Casualty & Surety Co.*, 177 Conn. 137, 140, 411 A.2d 937 (1979) ("[t]he knowledge and admissions of an attorney are imputed to his client"); see also *Dornemann* v. *Dornemann*, 48 Conn. Sup. 502, 511, 850 A.2d 273 (1979) ("[t]he actual review of the financial disclosure by each party is not mandated by the statute"). Even if we were to assume, for the sake of argument, its effectiveness with regard to the defendant's assets and liabilities, the disclosure made on that date did not contain any statement of the defendant's income.

Furthermore, even if the financial disclosure document the defendant sent to Foley on November 6, 1998, had contained this information, it is unlikely that the plaintiff would have been able adequately to evaluate it in the short time provided. Accordingly, given the

financial status before she married the defendant shows an admirable ability to manage her own finances. My review of this case, however, is under the clearly erroneous standard, and the trial court's factual findings specifically consider the disparity in business knowledge between the two parties. Because the trial court had the opportunity directly to assess and to judge the credibility of the witnesses in this case, I am bound by its factual findings in my review. See, e.g., *Greco* v. *Greco*, 275 Conn. 348, 359, 880 A.2d 872 (2005) ("[I]t is axiomatic that [t]he trial court's [factual] findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses." [Internal quotation marks omitted.]).

trial court's findings, the scope and timing of the disclosure raise serious doubts that "the parties were aware of their legal rights and their respective assets and liabilities, and proceeded by the agreement to alter those rights in a fair and voluntary manner." *McHugh* v. *McHugh*, supra, 181 Conn. 488. I, therefore, conclude that the trial court's finding of inadequate disclosure finds evidentiary support in the record.

Similarly, with regard to the second aspect of the clearly erroneous test, namely, whether "although there is evidence to support [the trial court's finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed"; (internal quotation marks omitted) *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem,* supra, 269 Conn. 149; I also cannot conclude that the trial court's finding of unreasonable financial disclosure was clearly erroneous. Indeed, the record does contain *some evidence* supporting the defendant's contention that the plaintiff received adequate financial disclosure. Specifically, the total net worth listed on the financial disclosure document attached to the agreement presented a facially accurate portrayal of the defendant's assets at the time of the marriage, and both it and the agreement were in Foley's possession four days before the plaintiff consulted him. Additionally, the defendant presented evidence at trial that the plaintiff had worked with the defendant, was familiar with his compensation, had observed his income tax information on several occasions, and oversaw the renovation of his considerable Westport home.

Nevertheless, it is well established that, on appeal, "[w]e cannot retry the facts or pass on the credibility of the witnesses." (Internal quotation marks omitted.) *Greco* v. *Greco*, 275 Conn. 348, 359, 880 A.2d 872 (2005). Consequently, although evidence exists in the record supporting both parties' positions, *considering the*

*record in its entirety*, I am not left with the definite and firm conviction that the trial court committed a mistake in finding that the defendant did not meet the statutory standard of fair and reasonable disclosure.

Because a signatory to a prenuptial agreement relinquishes significant legal rights, it is imperative that the "terms and the circumstances surrounding [the agreement's] execution are such as to demonstrate that the parties were aware of their legal rights and their respective assets and liabilities, and proceeded by the agreement to alter those rights in a fair and voluntary manner." *McHugh* v. *McHugh*, supra, 181 Conn. 488. I, therefore, conclude that, under the facts of the present case, in which an unsophisticated plaintiff facing the looming prospect of illegal-alien status was presented with an ambiguous financial disclosure document shortly before her wedding, the trial court's finding of unreasonable financial disclosure was not clearly erroneous.[8] The trial court, therefore, correctly determined that the agreement was unenforceable under § 46b-36g (a) (3). Accordingly, I now turn to the defendant's remaining claims, only one of which requires any consideration.

II

Because I would conclude that the agreement is unenforceable, I must consider the merits of the defendant's second claim with respect to the trial court's orders regarding the distribution of marital property. Specifically, the defendant contends, despite the statutory criteria governing the distribution of marital property; see

---

[8] I need not address the question of whether the plaintiff was afforded an adequate opportunity to consult with independent counsel pursuant to § 46b-36g (a) (4) because my agreement with the trial court's determination that the plaintiff did not receive fair and reasonable financial disclosure by itself renders the agreement unenforceable.

General Statutes § 46b-81;[9] that the trial court improperly began its analysis with a presumption that all property obtained during the marriage should be divided equally between the spouses. The trial court described the defendant's assets as follows: "The defendant owns a 40 percent capital interest in [Lydian Capital Advisors, LLC (LCA)]. The nonmarketable equity value of his interest is $1,187,967. . . . [LCA's] income from operations has grown exponentially in each year of operation and continues to grow as the amount of assets under management has grown. In the year 2000, the income was negative at ($194,638). In 2001, the income was $77,664; in 2002, $400,069; in 2003, $5,951,763. The defendant's income interest is 64.62 percent.

"[LCA] is the general partner of [Lydian Asset Management, L.P. (LAM)] and has a 14.32 percent capital ownership interest in [LAM]. The defendant has a direct 64.04 percent capital ownership interest in [LAM]. . . . [T]he defendant's current capital ownership interest in [LAM] is $1,684,584. . . .

"In addition to his capital ownership interest in [LAM], the defendant has deferred performance fees for the years 2000, 2001, 2002 and 2003. The amount deferred in 2000, was $4,200,000; in 2001, $10,475,721; in 2002, $3,739,537; and in 2003, $5,023,107. The deferred compensation investments have increased in value to

---

[9] General Statutes § 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a complaint under section 46b-45, the Superior Court may assign to either the husband or wife all or any part of the estate of the other. . . .

"(c) In fixing the nature and value of the property, if any, to be assigned, the court . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

a present total of $38,668,639. The investments are on a ten year deferral schedule. . . . After application of a price/net asset discount of 7 percent and a further application of a discount of 35 percent for lack of marketability, the gross value today of the defendant's deferred compensation is $23,375,192. . . . [The defendant's interest has] a current after-tax value of $13,370,610. The defendant's capital ownership interest and deferred compensation moneys at [LAM] are together worth $15,055,194 today in after-tax dollars. . . .

"The defendant [also] owns 75 percent of [Frisa I, LLC (Frisa)]. The sole asset of [Frisa] is commercial property in Westport, Connecticut. The fair market value of the property is $3,800,000. With a mortgage of $3,312,920, the net value is $487,080. [Frisa] also has cash on hand of $166,035 and miscellaneous small assets and debts. . . . [T]he defendant's current equity value in [Frisa] is $397,835."

The trial court concluded its findings regarding the defendant's assets, stating: "The defendant owned assets valued at $6,576,000 at the outset of the marriage. Although certain stock options and equity participation assets totaling almost one million dollars were sacrificed when the defendant left employment at Bankers Trust [International PLC], a portion of the defendant's lump sum separation package in 1999, recognized the loss of those benefits. The current after-tax value of the defendant's interest in the three hedge fund entities totals $17,137,613. The value of the real property at 9 Brookside Drive, Westport, Connecticut is $3,500,000. The apartment at 315 East 68th Street in New York City is worth $800,000. The condominium unit in Fort Lauderdale, Florida has a net equity of $100,000. Bank accounts total $40,164. Cars, motorcycles, the yacht and a snowmobile are valued at $88,041. Securities and bonds are worth $1,145,560. The defendant has 401(k)

accounts of $385,859. The total is $22,700,624. He also has accumulated frequent flier mileage, furnishings in his real properties, and jewelry."

The trial court continued, stating: "The court has considered all the criteria of General Statutes §§ 46b-56, 46b-56c, 46b-62, 46b-81, 46b-82 and 46b-84 in light of the evidence presented. Each of these parties performed the role that each contracted to perform in this marital partnership. If each party fulfilled his or her part of the bargain, the contribution of each party should be worth one half of the paid compensation received during the marriage. This is so even though no wages were paid for the plaintiff's services. *Beginning with the premise that the worth of the contribution of each party in a marriage of equals is of equal dollar value,* the criteria of the General Statutes must be applied. The defendant in this case enjoys substantial advantages over the plaintiff in the areas of occupation, amount and sources of income, vocational skills, employability and opportunity for future acquisition of capital assets and income. The length of the marriage is relatively short. It is appropriate to preserve for the defendant the advantage in assets that he held over the plaintiff at the outset of the marriage." (Emphasis added.)

Additionally, at the conclusion of the trial, the court engaged in the following colloquy with defense counsel: "[The Court]: . . . Isn't it all relative? I mean, let's say that, during the marriage, all that they saved was forty thousand dollars and it was all in his IRA. Wouldn't she be entitled to twenty thousand of it?

"[Defense Counsel]: No. It's not a community property state, Your Honor. This is equitable distribution. The court has to consider all—

"[The Court]: And a contract, which is essentially a fifty-fifty deal. Marriage.

"[Defense Counsel]: Your Honor, not in this state, Your Honor, in all due respect. It is not a contract fifty-fifty. It is not—you don't divide the assets fifty-fifty. This is not community property.

"[The Court]: It's not community property, but why don't we start with that as a marriage between equals and a contractual arrangement in which they have their different roles that they each perform?

"[Defense Counsel]: Your Honor, I think that's the legislature to make that finding. That is not the law. Equitable distribution is not the same as community property. In a short-term marriage—

"[The Court]: I agree, but what makes for equitable distribution? You're saying that—

"[Defense Counsel]: The statute criteria [§] 46b-81. [A litigant in another dissolution of marriage case] came before this court—before Judge Tierney—on a thirty-two year marriage and demonstrated that she was there from age twenty-two—whatever it was, Your Honor—helping support her husband when he had nothing to the point where he was at [General Electric Corporation] and, out of a hundred million dollars, she got twenty million dollars.

"[The Court]: Possibly a travesty. You're dealing with a different judge. . . .

"[The Court]: And you have to convince me that the work that—in this case for example—the wife has done in the household is worth less than half of the assets, and I haven't heard that argument—I mean, I haven't heard anything convincing as to why her efforts—you said, that isn't worth so many millions, and I'm not sure I heard why." On the basis of the foregoing findings, the trial court ordered that the defendant pay the plain-

tiff the previously mentioned $8,220,000 property award.[10]

I note that "[o]ur standard of review in domestic relations cases is a very narrow one," and, generally, "[w]e will not reverse a trial court's rulings with regard to custody and financial orders unless the court incorrectly applied the law or could not reasonably have concluded as it did." *Blake* v. *Blake*, 207 Conn. 217, 225, 541 A.2d 1201 (1988). Nevertheless, "[a]lthough it is well established that trial courts have broad equitable remedial powers regarding marital dissolutions . . . it is equally well settled that [c]ourts have no inherent power to transfer property from one spouse to another; instead, that power must rest upon an enabling statute. . . . Thus, the court's authority to transfer property appurtenant to a dissolution proceeding requires an interpretation of the relevant statutes. Statutory construction, in turn, presents a question of law over which our review is plenary." (Citations omitted; internal quotation marks omitted.) *Smith* v. *Smith*, 249 Conn. 265, 272, 752 A.2d 1023 (1999). Accordingly, because the trial court's judgment was predicated upon its construction of § 46b-81 as incorporating a presumption of equal distribution, I review that aspect of the trial court's order de novo.

The distribution of marital property is governed by § 46b-81, which provides in relevant part: "(a) At the time of entering a decree . . . dissolving a marriage . . . the Superior Court may assign to either the hus-

---

[10] As the defendant indicates in his brief, the trial court's award reflects its presumption of a fifty-fifty distribution of marital property. Specifically, the trial court found that the defendant possessed $22,700,624 in assets, $6,576,000 of which he had brought into the marriage. The trial court then "preserve[d] for the defendant the advantage in assets that he held over the plaintiff at the outset of the marriage," and, apparently, divided the remaining $16,124,624 worth of marital property approximately in half to arrive at its award of $8,220,000.

band or wife all or any part of the estate of the other. . . . (c) In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."[11]

Furthermore, although this court has not previously had occasion to discuss the present issue, the Appellate Court addressed it comprehensively in *Wendt* v. *Wendt*, 59 Conn. App. 656, 680–88, 757 A.2d 1225, cert. denied, 255 Conn. 918, 763 A.2d 1044 (2000). Notwithstanding the trial court's negative characterization of *Wendt*, which constituted binding precedent on it, I find the Appellate Court's reasoning therein highly persuasive. In *Wendt*, the Appellate Court stated: "It is well settled that a statute must be applied as its words direct. . . . [Section] 46b-81 (c) directs the court to consider numerous separately listed criteria. No language of presumption is contained in the statute. Indeed, § 46b-81 (a) permits the farthest reaches from an equal division as is possible, allowing the court to assign to either the husband or wife all or any part of the estate of the other. . . . The claimed equal division presumption is not part of the statutory criteria. On the basis of the plain language of § 46b-81, there is no presumption in Connecticut that marital property should be divided equally prior to applying the statutory criteria." (Cita-

[11] "This approach to property division is commonly referred to as an 'all-property' equitable distribution scheme." *Krafick* v. *Krafick*, 234 Conn. 783, 792, 663 A.2d 365 (1995).

tion omitted; internal quotation marks omitted.) Id., 682. The court in *Wendt* continued, stating: "Allowing the plaintiff's argument to persuade us would be, in effect, to write a community property law by judicial fiat. . . . In sum, in the absence of specific statutory language, there is no presumption of an equal property distribution in Connecticut. The legislative intent is to be found, not in what the legislature intended to say, but in the meaning of what it did say. . . . We must construe a statute without reference to whether we feel that it might be improved by adding to it or interpreting it differently. . . . It is our duty to apply the law, not to make it." (Citations omitted; internal quotation marks omitted.) Id., 683. Furthermore, in addition to the Appellate Court's comprehensive language based analysis, I note that no support for the trial court's presumption of equal distribution exists in the statute's voluminous legislative history.

The plaintiff agrees that there is no presumption, under § 46b-81, that marital property should be divided equally. She contends, nonetheless, that the trial court did not apply such a presumption, but merely divided the property fifty-fifty after applying the statutory criteria. In the alternative, the plaintiff argues that the trial court's conclusion constituted harmless error.

In light of the trial court's oral statements and memorandum of decision, however, the plaintiff's first contention is untenable. Moreover, the plaintiff does not ask this court to disavow *Wendt*, and I would apply the Appellate Court's persuasive reasoning in *Wendt* as the governing law in the present case.[12]

---

[12] I note also that *Wendt* is consistent with the rule in other equitable distribution jurisdictions. See, e.g., *Toth* v. *Toth*, 190 Ariz. 218, 221, 946 P.2d 900 (1997) ("the legislature's intent that the division be equitable, not equal, is clearly evidenced by the legislative history of the dissolution statute"); *Burwell* v. *Burwell*, 700 A.2d 219, 223 (D.C. App. 1997) ("[t]he divorce law contains no presumption in favor of an equal distribution of property; instead, it requires the court to divide the marital property 'in a manner that is equitable, just and reasonable' "); *Gussin* v. *Gussin*, 73 Haw. 470,

Additionally, the plaintiff's alternative argument, that the trial court's improper presumption was harmless, also lacks merit. In a civil case, an error is harmful if it likely affected the outcome at trial. *Pagano* v. *Ippoliti*, 245 Conn. 640, 651, 716 A.2d 848 (1998). The trial court's memorandum of decision and dialogue with defense counsel indicate that the court considered the presumption significant and based its decision, at least in part, on the defendant's inability to rebut the presumption. Under the circumstances, "[w]e cannot say, with any certainty, whether the trial court would have ruled the way that it did in the absence of such [a presumption] . . . ." *In re Samantha C.*, 268 Conn. 614, 675, 847 A.2d 883 (2004) (trial court's improper drawing of adverse inference for failure to testify in termination of parental rights case was not harmless error). Furthermore, it is

---

479, 836 P.2d 484 (1992) ("[t]here is . . . no fixed rule for determining the amount of property to be awarded each spouse in a divorce action other than as set forth in [the Hawaii statute]" [internal quotation marks omitted]); *Luedke* v. *Luedke*, 487 N.E.2d 133, 134 (Ind. 1985) ("to require . . . a rebuttable presumption of a 'fifty-fifty' split and require any variance to be supported by particular findings of fact, is to put an artificial structure on the fact-finding process which may very well impinge the trial judge's ability to openly weigh all the facts and circumstances, giving equal regard to all of them"); *Patricia B.* v. *Steven B.*, 186 App. Div. 2d 609, 611, 588 N.Y.S.2d 874 (1992) ("there is no basis in law for beginning an analysis concerning a business or a professional practice with a presumption that the parties must divide such an asset on an equal basis subject to modification after due consideration of the factors enumerated in [the New York statute]"); *Fratangelo* v. *Fratangelo*, 360 Pa. Super. 487, 502, 520 A.2d 1195 (1987) (Disapproving of fifty-fifty presumption and stating: "The starting point is unequivocally the consideration of all relevant [statutory] factors. This requires compilation, computation, weighing and balancing considerations, and then applying the sound discretion of the court to achieve economic justice."); *Shackelford* v. *Shackelford*, 39 Va. App. 201, 211, 571 S.E.2d 917 (2002) ("The requirement that the trial court consider all of the statutory factors necessarily implies substantive consideration of the evidence presented as it relates to all of these factors. . . . We find nothing in the [Virginia statute] or case law, and [the] wife provides no authority, that requires a fifty-fifty distribution of marital assets. A [50] percent distribution is not presumptively appropriate." [Citation omitted; internal quotation marks omitted.]).

axiomatic that "[t]he issues involving financial orders are entirely interwoven. The rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." (Internal quotation marks omitted.) *Greco* v. *Greco*, supra, 275 Conn. 354. I, therefore, conclude that the trial court's use of an improper presumption when distributing the marital property affected the outcome at trial and, accordingly, was not harmless error.[13]

Accordingly, I respectfully dissent from the majority opinion in this case. For all of the foregoing reasons, I would, therefore, reverse the judgment as to the financial orders only and remand the case for a new hearing on the remaining issues according to law.

---

[13] Because my conclusion with regard to this issue requires new financial orders, I need not reach the defendant's remaining claims, namely, that the trial court improperly: (1) determined that the defendant lacked credibility; (2) included in the defendant's income nearly five million dollars in nonexistent performance fees; and (3) calculated the defendant's hedge fund management fees.