KERSTIN LINDHOLM *v.* PETER M. BRANT ET AL.
(SC 17729)

Borden, Norcott, Katz, Zarella and Sullivan, Js.

Argued November 29, 2006—officially released July 3, 2007

*Lawrence I. Weinstein,* pro hac vice, with whom were *Anthony M. Fitzgerald,* and, on the brief, *Mara Lainie Taylor,* pro hac vice, *David S. Hardy* and *Kurt Hansson,* for the appellant (plaintiff).

*Wesley W. Horton,* with whom were *Karen L. Dowd,* and, on the brief, *Jay H. Sandak, Gary S. Klein* and *Stephanie McLaughlin,* for the appellee (named defendant et al.).

*Opinion*

SULLIVAN, J. The plaintiff, Kerstin Lindholm, appeals[1] from the judgment of the trial court in favor of

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

the named defendant, Peter M. Brant,[2] on the plaintiff's claim of conversion of a painting by Andy Warhol entitled "Red Elvis" (Red Elvis). The plaintiff claims on appeal that the trial court improperly determined that the defendant was a buyer in the ordinary course of business and, therefore, lawfully took all of the plaintiff's rights in Red Elvis pursuant to General Statutes § 42a-2-403 (2).[3] We disagree and affirm the judgment of the trial court.

The record reveals the following facts and procedural history, as detailed in the trial court's memorandum of decision. The plaintiff was introduced to Anders Malmberg, a Swedish art dealer, in the late 1970's or early 1980's during the course of her marriage to Magnus Lindholm (Lindholm). Throughout the next thirty years, Malmberg served as an art advisor to both the plaintiff and Lindholm. In his capacity as an art dealer, Malmberg assisted the plaintiff in her purchase of two works of art, and assisted Lindholm in multiple purchases and sales of works of art. Malmberg handled all of the Lindholms' purchase and sale transactions for works of art.

In 1987, the plaintiff purchased Red Elvis from Malmberg for $300,000. The only written documentation evidencing the plaintiff's purchase of Red Elvis was the invoice that she received from Malmberg, written on Malmberg's stationery. During the process of purchasing Red Elvis, the plaintiff relied entirely on Malmberg to complete the transaction.

In 1989, the plaintiff, with the assistance of Malmberg, loaned Red Elvis to the Museum of Modern Art in New

[2] Although the plaintiff's complaint also named the Brant Foundation, Inc., and Anders Malmberg as defendants, the plaintiff did not appeal from the judgment in favor of the Brant Foundation, Inc., and withdrew her complaint against Malmberg prior to trial. For purposes of this appeal, therefore, references to the defendant are to Peter M. Brant.

[3] General Statutes § 42a-2-403 (2) provides: "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business."

York to be included in a Warhol exhibition. A label affixed to the painting indicated that it was owned by a "[p]rivate [c]ollector" and had been loaned to the Museum of Modern Art "[c]ourtesy Anders Malmberg." The defendant visited the exhibition, viewed Red Elvis and saw its label, thereby becoming aware that Malmberg was associated with Red Elvis and its owner.[4]

In 1996, the Guggenheim Museum (Guggenheim) decided to sponsor an exhibition of Warhol paintings that would travel to several European venues, ending in New York City during the summer of 2000. Vivien Greene, an assistant curator at the Guggenheim, prepared a list of Warhol works of art to be considered for inclusion in the exhibition. Red Elvis was one of the works of art on the list. Also included on the list were several works of art owned by the defendant, who at this time was a member of the Guggenheim's board of trustees.

In late summer of 1998, Germano Celant, a curator of the exhibition, met with the defendant to discuss loaning some of his Warhol artwork to the exhibition. In addition, Celant asked the defendant to assist him in obtaining loans of other Warhol artwork for the exhibition, including Red Elvis. The defendant advised Celant that he believed that Red Elvis was owned by a Swedish woman and that Celant should contact either Stellan Holm, a Swedish art dealer, or James Mayer, a London art dealer, for more information. The defendant referred Celant to Holm and Mayer because he knew that Malmberg was associated with Red Elvis and its owner, and that Holm and Mayer had had previous business relations with Malmberg. The defendant also spoke to Holm, who had worked with the defendant on numerous occasions buying and selling Warhol artworks.

---

[4] The defendant had purchased Red Elvis in or around 1969, when he was a young college student, and had owned the painting for a brief period of time.

In the fall of 1998, the defendant had never met Malmberg, but was aware that he enjoyed a reputation as a well respected art dealer. At that time, the defendant did not personally know either the plaintiff or Lindholm.

Through the efforts of Holm, who had contacted Malmberg, the plaintiff agreed to lend Red Elvis to the exhibition. Holm notified the defendant that the plaintiff would lend Red Elvis to the Guggenheim and that her name would be listed on the loan forms. Malmberg helped the plaintiff to complete the loan forms, in which the plaintiff requested that the exhibition display Red Elvis with an identification plaque that read " 'Private Collection, Courtesy Anders Malmberg, Malmo, Sweden.' " The defendant assisted the Guggenheim with the shipping arrangements for Red Elvis, which was sent from the United States to Europe in September, 1998. Accordingly, as of September, 1998, the defendant knew from Holm that the plaintiff owned Red Elvis and that it was on loan to the Guggenheim for a Warhol exhibition.

In 1998, Lindholm initiated divorce proceedings against the plaintiff in Connecticut. Because of a shortage of funds, the plaintiff enlisted Malmberg to assist her in selling certain works of art located in the Lindholms' residence in Greenwich. On November 16, 1999, the plaintiff and Malmberg entered into an agreement that designated Malmberg as the plaintiff's agent for the purpose of selling " 'certain works.' " Although the agreement did not specify which artworks Malmberg was authorized to sell, the plaintiff had neither agreed to sell nor discussed with Malmberg or anyone else the possibility of selling Red Elvis.

On December 6, 1999, the family court issued an order requiring the plaintiff "to immediately return . . . all artwork and other property which she removed from the marital home whether claimed by [Lindholm] or [the plaintiff]" and enjoining the plaintiff "from selling

property without a court order . . . ."[5] On December 8, 1999, the plaintiff's divorce counsel wrote a letter to Malmberg notifying him of the court order, thereby putting Malmberg on notice that he no longer was authorized to sell any property of either the plaintiff or Lindholm.

During this same time period, Holm, who had been working closely with the defendant in the purchase and sale of other Warhol works of art, advised the defendant, on the basis of a conversation with Malmberg, that Malmberg had purchased Red Elvis. Holm also asked whether the defendant would be interested in purchasing the painting if it became available for sale. Soon afterward, the defendant met with Holm and Malmberg at the defendant's residence. When Malmberg and Holm repeated that Malmberg had purchased Red Elvis from the plaintiff and asked whether the defendant would be interested in purchasing it, the defendant indicated that he would.

On or about February 2, 2000, the defendant agreed to pay Malmberg $2.9 million dollars for Red Elvis. Malmberg gave the defendant an invoice for the $2.9 million sale, indicating that a $900,000 deposit would be required immediately and that the balance would be due by a certain date. Although the defendant wired the deposit money to Malmberg, he objected to paying the balance prior to delivery of the painting without first entering into a formal contract with Malmberg. The defendant retained counsel to draft a contract and to conduct the necessary lien searches to identify any claims that Lindholm, who was in the midst of a bitter divorce and was reputed to be litigious, might have to the painting. During the contract negotiations, the law firm that the defendant had retained conducted a lien

[5] This order was not lifted until the Lindholms' divorce was finalized in June, 2000.

search and an Art Loss Register[6] search relating to Red Elvis. Neither search revealed a claim or lien by Lindholm or any other individual. The defendant's counsel cautioned the defendant, however, that these searches only provided "minimal assurances" that Malmberg had good title to the painting.

The defendant and Malmberg exchanged numerous drafts of the contract during the negotiations, which were completed on March 20, 2000. Ultimately, Malmberg agreed to delay payment of the balance until the delivery of Red Elvis to a bonded warehouse in Denmark.

During the negotiations, Holm served as a messenger between Malmberg and the defendant's counsel. In an effort to address the defendant's concerns about Lindholm's potential claims, Holm prepared a letter (the Swedish-English letter) to be signed by the plaintiff stating that she had good title when she sold the painting to Malmberg. The letter would be treated as confidential unless Lindholm made a claim to Red Elvis. Holm showed the letter to the defendant, but the letter was never signed by the plaintiff. When the defendant's counsel requested a copy of the signed letter, Holm refused, stating that it was none of the defendant's business. The defendant's counsel communicated Holm's response to the defendant.

The defendant also was concerned that, even though Holm had assured him that Malmberg was the current owner, Malmberg had not yet acquired title to the painting or that this transaction was going to be a "flip."[7]

---

[6] The Art Loss Register is a permanent international database of stolen and missing works of art recognized as the best mechanism for determining whether a piece of art is stolen.

[7] "Flipping" is a term of art in the art industry that refers to a situation in which the purchaser of a painting immediately sells the painting for a higher price. The second purchase is often conditioned on the new owner's concealing the sale from the original owner. To prevent flipping, owners often will ask purchasers to agree not to resell the painting for a period of one year.

The defendant's counsel, in an effort to clarify whether Malmberg owned the painting, requested a copy of the invoice from the plaintiff to Malmberg. Malmberg denied this request on the ground that such invoices are not normally and customarily disclosed in the context of an art transaction.

On February 17, 2000, during the contract negotiations between the defendant and Malmberg, the Guggenheim notified the plaintiff, as a lender to the Warhol exhibition, that the exhibition would be terminating prematurely. At that point, the plaintiff agreed, at the suggestion of Greene, to lend Red Elvis to the branch of the Guggenheim located in Bilbao, Spain. After Malmberg advised the plaintiff that Red Elvis would get better exposure at an exhibition at the Louisiana Museum in Copenhagen, Denmark, the plaintiff agreed to lend the painting to the Louisiana Museum. The plaintiff did not inform Greene that she had changed her mind about displaying the painting in Bilbao until Greene called her on March 17, 2000.

Also on March 17, 2000, the defendant spoke with Elissa Myerowitz, a registrar employed by the Guggenheim, to inquire when his Warhol works of art would be returned to him. The defendant also asked about the current status of Red Elvis. Myerowitz indicated that the painting was being returned to the plaintiff, who was listed as the lender on the loan forms. The defendant advised Myerowitz that the plaintiff no longer owned Red Elvis and that she should contact the new owner, Malmberg, because it was his understanding that Malmberg wanted Red Elvis to go to Denmark. The defendant believed that Red Elvis was going to be shipped to Denmark because, at that time in the negotiations, he had agreed to accept delivery there. Myerowitz then told Greene about her conversation with the defendant, after which Greene called the plaintiff. During this conversation, the plaintiff informed

Greene that she had changed her mind and had decided to lend the painting to the Louisiana Museum. The plaintiff also informed Greene that Red Elvis should be released to Malmberg's custody because he was going to arrange for the shipment of the painting to Denmark. Greene advised the plaintiff that she would have to provide the Guggenheim with a letter authorizing the Guggenheim to release Red Elvis to Malmberg, which the plaintiff did on March 20, 2000. Greene then informed Myerowitz of the substance of Greene's conversation with the plaintiff, confirming that Red Elvis was to be released to Malmberg for shipment to the museum in Denmark. On March 21, 2000, the defendant called Myerowitz to inform her about the shipping arrangements to Denmark.

On April 12, 2000, after execution of the purchase contract, the defendant wired the remaining $2 million purchase price to Malmberg's bank account and took possession of Red Elvis. On April 27, 2000, the defendant had the painting insured and arranged to have it shipped from Denmark to the United States. The defendant then allowed Red Elvis to be shown in a traveling exhibition from May, 2000, through the end of 2002, doing nothing to conceal the fact that he believed that he owned the painting.

From March, 2000, until the fall of 2000, the plaintiff took no steps to verify that Red Elvis was on display at the Louisiana Museum but, instead, relied on Malmberg's representations that the painting was there. In the fall of 2000, Malmberg informed the plaintiff that Red Elvis had not arrived at the Louisiana Museum in time to be a part of the exhibition. Thereafter, following an inquiry from Malmberg, the plaintiff authorized the sale of Red Elvis for $4.6 million to a Japanese buyer. The plaintiff authorized Malmberg to ship Red Elvis to Japan. In January, 2001, the plaintiff met with Malmberg and delivered an invoice conveying title to Red Elvis

to one of Malmberg's companies, Eagle Eye Art Invest-
ments, Inc. The plaintiff agreed to have the sale pro-
ceeds sent directly to Malmberg's bank account. When
the plaintiff agreed to sell Red Elvis for $4.6 million,
she believed that she still owned Red Elvis, and was
unaware that Malmberg already had sold the painting
to the defendant in March, 2000.

In June, 2001, while awaiting her $4.6 million payment
from the sale to the Japanese buyer, the plaintiff read
a magazine article that reported that the defendant had
purchased Red Elvis from Malmberg. When the plaintiff
telephoned Malmberg, he told her that the article was
inaccurate and that the defendant actually had bought
a different painting, which was referred to as Green
Elvis. For more than one year from the time that the
plaintiff learned that the defendant had purchased Red
Elvis, the plaintiff unsuccessfully sought the return of
the sale proceeds from Malmberg.

On April 5, 2002, counsel for the plaintiff sent a letter
to the defendant informing him that Malmberg's pur-
ported sale of Red Elvis to the defendant had not been
authorized by the plaintiff and that title in the painting
had not passed to the defendant. He further stated that,
if the defendant did not return the painting to the plain-
tiff, she would commence proceedings against the
defendant in the United States to recover the painting.

On November 5, 2002, the plaintiff filed an amended
complaint alleging, inter alia, conversion, conspiracy to
commit fraud, statutory theft, and unjust enrichment
against the defendant.[8] With respect to all counts, the

[8] In January, 2003, the plaintiff filed a complaint in Sweden seeking to
have Malmberg criminally prosecuted. In March, 2003, the Swedish court
convicted Malmberg of gross fraud embezzlement and rendered judgment
in favor of the plaintiff in the amount of $4.6 million. The Swedish court
allowed the plaintiff to pursue additional damages against Malmberg in the
future. Subsequently, on May 24, 2005, the plaintiff withdrew her claims
against Malmberg in this action. See footnote 2 of this opinion.

defendant asserted the special defense that he was a buyer in the ordinary course of business pursuant to § 42a-2-403 (2), under which he took all of the plaintiff's rights to Red Elvis.

At trial, the defendant presented expert testimony that, in the art industry, it was the ordinary and customary practice that if an individual regularly worked with a particular art dealer or an art dealer was identified on the identification label of a loaned work of art, inquiries about an art transaction would be presented to the art dealer rather than directly to the principal. Buyers ordinarily and customarily relied on representations made by respected dealers regarding their authority to sell works of art. Purchases and sales of works of art were documented solely by a single invoice from seller to buyer. It was also ordinary and customary to proceed with the purchase of valuable works of art without requesting or receiving documentary proof that the selling dealer had the authority to sell the work of art.

Following a trial to the court, the trial court issued a memorandum of decision on August 29, 2005, in which it concluded that the defendant had satisfied his burden of proving that he was a buyer in the ordinary course of business, and rendered judgment in favor of the defendant. The court noted that the defendant, a merchant, had bought Red Elvis in good faith by observing reasonable commercial standards of fair dealing in the art industry and by taking reasonable steps to investigate title. The court further recognized that "the vast majority of art transactions . . . are completed on a handshake and an exchange of an invoice," and found that the defendant had taken the unusual steps of "retaining counsel, authorizing counsel to engage in due diligence and insisting on formal contract documents [containing warranties and representations] in addition to an invoice." In addition, the court indicated that the defendant's counsel had conducted a lien search and

an Art Loss Register search that revealed no defects in title, and found that the defendant reasonably had relied on the assurances of Malmberg and Holm, both of whom had reputations as honest and trustworthy art dealers. Moreover, the court concluded that it was reasonable for the defendant to believe that Malmberg had title to the painting because the Guggenheim had released the painting to him and he had been able to deliver Red Elvis to the defendant in Denmark. Because the plaintiff had been represented by an art dealer, it would have been inappropriate for the defendant to contact the plaintiff directly. The court concluded, on the basis of the reasonable steps taken by the defendant, that it would have been an extraordinary measure for the defendant to have insisted on seeing the signed Swedish-English letter or the invoice from the plaintiff to Malmberg.

This appeal followed. The plaintiff claims that the trial court improperly concluded that the defendant took good title to Red Elvis as a buyer in the ordinary course of business because: (1) the defendant was an art merchant who had valid concerns about Malmberg's ability to convey title; (2) applicable commercial standards of fair dealing required the defendant to "investigate [the transaction] scrupulously"; (3) the investigation conducted by the defendant's counsel provided only "minimal assurances" that Malmberg had good title; (4) Malmberg refused to provide documentary proof that he owned Red Elvis; and (5) the defendant could have discovered that Malmberg did not have good title and that a court order precluded the plaintiff from selling the painting if he had telephoned the plaintiff, the plaintiff's counsel, Lindholm, or Lindholm's counsel. We disagree and, accordingly, affirm the judgment of the trial court.

As a preliminary matter, we set forth the appropriate standard of review. "Historical facts constitute a recital

of external events and the credibility of their narrators. So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense. . . . [Such questions require] plenary review by this court unfettered by the clearly erroneous standard. . . . When legal conclusions of the trial court are challenged on appeal, we must decide whether [those] . . . conclusions are legally and logically correct and find support in the facts that appear in the record." (Citation omitted; internal quotation marks omitted.) *Friezo* v. *Friezo*, 281 Conn. 166, 181, 914 A.2d 533 (2007). Here, we must determine whether the trial court properly concluded that the defendant was a buyer in the ordinary course of business. This requires application of the legal standards in the governing statutes to the underlying historical facts. Accordingly, the plaintiff's claim that the defendant is not a buyer in the ordinary course is a mixed question of fact and law subject to our plenary review.

The plaintiff claims that the trial court improperly found that the defendant had established his affirmative defense that he was a buyer in the ordinary course, and, therefore, took all of the plaintiff's rights to Red Elvis. "It is an elementary rule that whenever the existence of any fact is necessary in order that a party may make out his case or establish his defense, the burden is on such party to show the existence of such fact." (Internal quotation marks omitted.) *Zhang* v. *Omnipoint Communications Enterprises, Inc.*, 272 Conn. 627, 645, 866 A.2d 588 (2005). Therefore, the burden was on the defendant to show the existence of such facts as would entitle him to the status of a buyer in the ordinary course pursuant to § 42a-2-403.

Section 42a-2-403 (2) provides that "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights

of the entruster to a buyer in ordinary course of business." " 'Entrusting' " is defined as "any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law." General Statutes § 42a-2-403 (3).

There is no dispute in the present case that the plaintiff's March 20, 2000 letter authorizing the Guggenheim to release Red Elvis to Malmberg constituted an entrustment under § 42a-2-403 (3), or that Malmberg, an art dealer, is a merchant dealing in "goods of that kind"—works of art—under § 42a-2-403 (2). Under the plain language of § 42a-2-403 (2) and (3), therefore, Malmberg, as a merchant dealing in art entrusted with the painting, had the power to transfer all the rights of the entruster to a buyer in the ordinary course of business.

A " '[b]uyer in [the] ordinary course of business' " is defined as "a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. . . ." General Statutes § 42a-1-201 (9).[9] A person buys goods in good faith if there

[9] The trial court in its analysis relied on the current version of § 42a-1-201 (9). At the time of the sale from Malmberg to the defendant, a buyer in the ordinary course of business was defined as "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. . . ." General Statutes (Rev. to 1999) § 42a-1-201 (9). Neither party contends that the trial court used the wrong

is "honesty in fact and the observance of reasonable commercial standards of fair dealing" in the conduct or transaction concerned. General Statutes § 42a-1-201 (20).[10]

We are required, therefore, to determine whether the defendant followed the usual or customary practices and observed reasonable commercial standards of fair dealing in the art industry in his dealings with Malmberg. As we have indicated, the defendant presented expert testimony that the vast majority of art transactions, in which the buyer has no reason for concern about the seller's ability to convey good title, are "completed on a handshake and an exchange of an invoice." It is not customary for sophisticated buyers and sellers to obtain a signed invoice from the original seller to the dealer prior to a transaction, nor is it an ordinary or customary practice to request the underlying invoice or corroborating information as to a dealer's authority to convey title. Moreover, it is not customary to approach the owner of an artwork if the owner regularly worked with a particular art dealer because any inquiries about an art transaction customarily are presented to the art dealer rather than directly to the principal.

---

statutory standard for determining whether the defendant is a buyer in the ordinary course of business. We also note that the second sentence of the current version of § 42a-1-201 (9), which was added to the statute by Public Acts 2001, No. 01-132, § 135, can be interpreted as codifying the standard in existing case law, that a sale must comport with the usual or customary practices in the kind of business in which the seller is engaged. For convenience and consistency in our analysis, we refer to the current version of § 42a-1-201 (9).

[10] The trial court in its analysis used the version of the statute in effect at the time of the sale, which provided that " '[g]ood faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." General Statutes (Rev. to 1999) § 42a-2-103 (1) (b). That language currently is codified at § 42a-1-201 (20). See Public Acts 2005, No. 05-109, §§ 7 and 23. Because both definitions contain identical language, we refer to the current definition of good faith in § 42a-1-201 (20) for convenience.

It is customary to rely upon representations made by respected dealers regarding their authority to sell works of art. A dealer customarily is not required to present an invoice establishing when and from whom he bought the artwork or the conditions of the purchase.

We are compelled to conclude, however, that the sale from Malmberg to the defendant was unlike the vast majority of art transactions. The defendant had good reason to be concerned that Lindholm might have claims to the painting. Several courts have held that, under such circumstances, a handshake and an exchange of invoice is not sufficient to confer status as a buyer in the ordinary course. In *Porter* v. *Wertz*, 68 App. Div. 141, 143, 416 N.Y.S.2d 254 (1979), aff'd, 53 N.Y.2d 696, 421 N.E.2d 500, 439 N.Y.S.2d 105 (1981), for example, the owner of a painting entrusted it to an individual with whom he previously had conducted art transactions for display in the individual's home. This individual then used the services of a delicatessen employee, posing as an art dealer, to sell the painting to a merchant art buyer. Id., 145–46. In discussing the good faith obligation of a merchant, the court stated that although the definition of good faith "by its terms embraces the reasonable commercial standards of fair dealing in the trade, it should not—and cannot—be interpreted to permit, countenance or condone commercial standards of sharp trade practice or indifference as to the provenance, i.e., history of ownership or the right to possess or sell an object d'art . . . ." (Internal quotation marks omitted.) Id., 146. The buyer made no inquiry as to whether the purported art dealer, who was in fact a delicatessen employee, was the owner of the painting or had been authorized by the owner to sell the painting. Id. Because a simple telephone call would have revealed the fact that the defendant was not an art merchant, thereby leading to doubt that would have required further verification, the court con-

cluded that the buyer could not claim buyer in the ordinary course of business status. Id., 146–47.

In *Howley* v. *Sotheby's, Inc.*, New York Law Journal, Vol. 195 (February 20, 1986) p.6, col. 3B, the owner of a painting sought its recovery from the defendant art dealer. The defendant had purchased the painting from the caretaker of the owner's home, who had posed as the owner's nephew, even though the defendant was unsure whether the "owner's nephew" had authority to sell the painting. Id. The court concluded that, because the defendant was a professional art dealer, he should have been "scrupulously concerned with taking proper title in anything he purchases." Id. Because the defendant had not taken any steps to verify title, even after the "owner's nephew" informed him that the sale first needed the owner's approval, the defendant did not fulfill his obligation and was liable for conversion. Id.

In *Cantor* v. *Anderson*, 639 F. Sup. 364, 367–68 (S.D.N.Y.), aff'd, 833 F.2d 1002 (2d Cir. 1986), the court, citing *Howley*, imposed a duty upon a sophisticated buyer to inquire into a painting's ownership when circumstances dictate. In *Cantor*, the buyer and the seller had engaged in numerous previous art transactions. Id., 366. When the buyer sought the return of several of his artworks that were on consignment with the seller, the seller gave the buyer a painting, to which he claimed ownership, as security for the artworks on consignment. Id., 367. The buyer, who had been aware of the seller's financial difficulties and was familiar with the seller's practice of selling works on consignment, had reason to doubt the seller's ownership of the painting. Id., 368. This doubt led to a duty to obtain some verification that the seller had good title. Because the buyer had made no efforts to verify title to the painting, choosing to rely solely on the seller's assurances, the court concluded that the buyer had not fulfilled his duty and was liable for conversion. Id., 368–69.

Finally, in *Morgold, Inc.* v. *Keeler*, 891 F. Sup. 1361, 1369 (N.D. Cal. 1995), the court held that an art dealer buyer had obtained good title to a painting by satisfying "the reasonable commercial standards in the art industry . . . ."[11] In that case, the buyer and the seller had engaged in previous art transactions for several years. Id., 1364. When the buyer purchased the painting from the seller, he was unaware that the seller had only a one-half interest in the painting. Id., 1363–65. The court imposed a duty on "dealers in art [to] take reasonable steps to inquire into the title to a painting, particularly if there are warnings that something is wrong with a transaction." Id., 1368. In *Morgold, Inc.*, the buyer had engaged in previous art transactions with the seller and had contacted an expert on the artist, who gave no indication of problems with the painting's title. Id., 1365. Because there were no other warning signs indicating problems with title, the court concluded that the buyer had fulfilled his duty to make a reasonable inquiry and had acquired good title and a right to possession of the painting. Id., 1369.

We agree with these courts that a merchant buyer has a heightened duty of inquiry when a reasonable merchant would have doubts or questions regarding the seller's authority to sell. We further conclude that the steps that a merchant must take to conform to reasonable commercial standards before consummating a deal depend on all of the facts and circumstances surrounding the sale. In the present case, the defendant had concerns about Malmberg's ability to convey good title to Red Elvis because he believed that Lindholm might have had a claim to the painting. The defendant

[11] Although the court in *Morgold, Inc.* v. *Keeler*, supra, 891 F. Sup. 1367, analyzed the buyer's obligation to act in good faith pursuant to § 2403 of the California Uniform Commercial Code, that definition is the same as the definition of good faith applicable to a buyer seeking status as a buyer in the ordinary course of business pursuant to § 42a-2-403, and is, therefore, relevant to our analysis.

also was concerned that Malmberg had not yet acquired title to the painting or that the transaction might be a "flip."

Because of his concern that Lindholm might make a claim to Red Elvis, the defendant took the extraordinary step of hiring counsel to conduct an investigation and to negotiate a formal contract of sale on his behalf. He also insisted on and obtained a formal contract containing representations and warranties that Malmberg had title to the painting. In addition, during the course of the investigation, the defendant's counsel conducted both a lien search and an Art Loss Register search that revealed no competing claims to Red Elvis. Although the defendant was cautioned that the searches provided only minimal assurance that Malmberg had good title to the painting, such searches typically are not conducted during the course of a normal art transaction and, therefore, provided the defendant with at least some assurance that Lindholm had no claims to the painting.

Moreover, the evidence was sufficient for the trial court reasonably to conclude that at all times during the transaction, both Malmberg and Holm had reputations as honest, reliable, and trustworthy art dealers. This is not like the situation in *Porter* v. *Wertz*, supra, 68 App. Div. 146, in which the court concluded that the buyer was not a buyer in the ordinary course of business because he did not know the dealer or his reputation. The defendant had little reason to doubt Malmberg's claim that he was the owner of Red Elvis, and any doubts that he did have reasonably were allayed by relying on Holm's assurances that Malmberg had bought the painting from the plaintiff because she needed money due to her divorce. The defendant established at trial that it is customary to rely on the assurances of respected art dealers when conducting a transaction,

and the defendant had no reason to depart from this practice.

The defendant's concerns were further allayed when Malmberg delivered Red Elvis to a bonded warehouse in Denmark, the delivery location the parties had agreed to in the contract of sale. At the time of the sale, the painting was on loan to the Guggenheim, whose policy it was to release a painting on loan only to the true owner, or to someone the true owner had authorized to take possession. The defendant was not informed that the plaintiff had authorized release to Malmberg for the sole purpose of lending the painting to a museum in Denmark. Knowing that the Guggenheim would release the painting to an authorized party only, it was reasonable for the defendant to believe that Malmberg was the true owner of the painting. We conclude that these steps were sufficient to conform to reasonable commercial standards for the sale of artwork under the circumstances and, therefore, that the defendant had status as a buyer in the ordinary course of business.

We recognize that the customary practice in the art industry of not requiring a merchant buyer to obtain documentary proof that the seller owns the work of art whenever there are reasonable doubts or questions regarding the seller's authority to sell imposes risks on persons who entrust art to an art dealer. Section 42a-1-201 (9) evinces a legislative desire, however, for courts to respect "the usual or customary practices in the kind of business in which the seller is engaged . . . ." We are not entitled to impose the type of business practices that we would prefer.

Moreover, the evidence presented at trial established that the reason that documentary proof of ownership customarily is not required is to protect the confidentiality of the owner and the buyer. Requiring a merchant buyer to obtain an invoice or other supporting docu-

mentation proving the seller's ownership would in every transaction destroy the privacy and confidentiality that buyers and sellers have come to desire and expect. Accordingly, only when circumstances surrounding the sale cast severe doubt on the ownership of the artwork are merchant buyers required to obtain documentary assurance that the seller has good title. In this instance, the Swedish-English letter was produced at Holm's suggestion to give the defendant assurance that the *plaintiff* had good title when she sold the painting to Malmberg. In light of the customary practices in the industry, the defendant reasonably could have concluded that Malmberg was unwilling to produce a signed copy of the letter because of his desire to protect the owner's expectation of confidentiality in their transaction. The purpose of the letter was not to give the defendant assurance that *Malmberg* had good title to the painting, and any concerns about Malmberg's title that could be inferred from the refusal to show the defendant a signed copy of the letter were quickly allayed by Malmberg's subsequent delivery of the painting to Denmark. Accordingly, we conclude, on the basis of all the circumstances surrounding this sale, that the defendant's failure to obtain an invoice from the plaintiff to Malmberg or a signed copy of the Swedish-English letter does not strip him of his status as a buyer in the ordinary course of business. For the same reasons, we conclude that the defendant was not required to contact directly the plaintiff or other parties who might have had knowledge concerning Red Elvis' title.

We conclude that the trial court properly determined that the defendant was a buyer in the ordinary course of business and, therefore, took all rights the plaintiff had to the painting pursuant to § 42a-2-403 (2).

The judgment is affirmed.

In this opinion the other justices concurred.